**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**September 20, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

ORHAN YAVUZ,

      Plaintiff - Appellant,

  v.

61 MM, LTD, an Oklahoma limited partnership; 61 MM CORP., an Oklahoma corporation; ADI KAMEL MOHAMED, also known as Kamal Adi; FPM S.A., a corporation, doing business as FPM Finastate Projects Management S.A., a Swiss corporation,

      Defendants - Appellees,

--------------------------------------------

ORHAN YAVUZ,

      Plaintiff - Appellant,

  v.

61 MM, LTD., an Oklahoma limited partnership; 61 MM CORP., an Oklahoma corporation; ADI KAMEL MOHAMED, also known as Kamal Adi; FPM S.A., doing business as FPM Finastate Projects Management S.A., a Swiss corporation,

      Defendants - Appellees.

No. 04-5152

Nos. 04-5188 and 05-5155

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE N. DISTRICT OF OKLAHOMA
(D.C. NO. CV-03-586-E(J))**

Kenneth Michael Smith, (Robert P. Skeith, with him on the brief), Riggs, Abney, Neal, Turpen, Orbison & Lewis, Tulsa, Oklahoma, for Plaintiff - Appellant.

Timothy A. Carney, (James M. Sturdivant, Cason P. Carter, with him on the brief), Gable & Gotwals, Tulsa, Oklahoma, for Defendants - Appellees, Kamal Adi and FPM, S.A.

Grant E. Cheadle, Cheadle & Associates, Inc., Tulsa, Oklahoma, for Defendants - Appellees, 61 MM Corp. and 61 MM Ltd.

Before **HARTZ**, **McKAY**, and **TYMKOVICH**, Circuit Judges.

**HARTZ**, Circuit Judge.

Orhan Yavuz, a Turkish citizen, has been involved in various international business transactions with Kamal Adi, a dual Syrian and Swiss citizen, since the early 1980s. Frustrated with the treatment of what he considers an investment in certain real property in Tulsa, Oklahoma (the Tulsa Property), Mr. Yavuz has brought suit against Mr. Adi and others, seeking relief under the federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964(c), and a variety of other causes of action based on allegations of misrepresentations and breach of contract. Title to the Tulsa Property is held by a

limited partnership, 61 MM, Ltd., whose general partner is 61 MM Corp., an Oklahoma corporation. The partnership and the corporation are both parties to this dispute and will be referred to collectively as the 61 MM Defendants. The remaining defendant who is a party to this appeal is FPM S.A. d/b/a Finastate Projects Management S.A. (FPM), a Swiss corporation whose principal place of business is Fribourg, Switzerland. Two other defendants, Euroeast Corp. and Sigofine S.A., both of which are Panamanian corporations, have not been served.

The district court dismissed the suit for improper venue on the basis of a forum-selection clause in a 1989 written agreement (the Fiduciary Agreement) between Mr. Yavuz and Finastate SA. (FSM is the successor in interest to Finastate SA, and the latter will be referred to as FSM in this opinion.) On appeal Mr. Yavuz argues that the district court erred by (1) dismissing the case under the forum-selection clause; (2) dismissing the case under the doctrine of forum non conveniens (to the extent that the court relied on that doctrine); and (3) dismissing the case against the 61 MM Defendants, who were not parties to the Fiduciary Agreement and who forfeited any objection to venue by not timely raising it. He also contends that the district court erred in ordering him to execute documents to remove any cloud on the title to the Tulsa Property.

We have jurisdiction under 28 U.S.C. § 1291. We hold that when an international commercial agreement has both choice-of-law and forum-selection

provisions, the forum-selection provision must ordinarily be interpreted under the law chosen by the parties. We reverse and remand for further proceedings regarding the meaning under Swiss law of the forum-selection clause and whether dismissal is appropriate under the doctrine of forum non conveniens. We need not address Mr. Yavuz's arguments directed specifically at the dismissal of the 61 MM Defendants. Also, we vacate the order requiring Mr. Yavuz to execute documents.

## I. FACTS AND PROCEDURAL BACKGROUND

### A. State-Court Proceedings

Mr. Yavuz filed suit in the District Court of Tulsa County, Oklahoma, on June 18, 2002, against Lee James A. Bentley, an individual whom he believed to control the Tulsa Property. On September 27, 2002, he filed an amended petition adding the 61 MM Defendants, and dropping Bentley. The 61 MM Defendants filed an answer, asserted a counterclaim against Mr. Yavuz, and moved for summary judgment. The state court denied the summary-judgment motion on February 10, 2003. Meanwhile, FPM had filed suit in Switzerland against Mr. Yavuz on December 24, 2002, to enforce his alleged promise to invest further funds in the Tulsa Property.

On July 28, 2003, Mr. Yavuz filed a Second Amended and Restated Petition (Second Amended Petition), adding Mr. Adi, FPM, Euroeast Corp., and Sigofine

S.A. as defendants. The Second Amended Petition alleged the following course of conduct:

Mr. Yavuz first gave "gold, silver and foreign currencies" to Mr. Adi and Euroeast in "the early 1980's," Aplt. App. at 58, for "various investment purposes," including an interest in the Tulsa Property, *id*. at 59. According to the terms of the parties' investment agreement, outlined in a letter dated February 11, 1981, Mr. Yavuz was to have a 20% ownership share in the Tulsa Property.

At some unspecified point in the 1980s, Mr. Yavuz discovered that the defendants "had misappropriated much of the gold and silver" that he had placed with them. *Id*. at 59. He confronted Mr. Adi in 1989 about the missing commodities, and Mr. Adi offered to settle the dispute by compensating Mr. Yavuz in the form of a loan in addition to the 20% interest in the Tulsa Property. The amount of the loan, about $735,000, was the value of the gold and silver that Mr. Adi had "misappropriated," plus accumulated interest. *Id*. This new agreement was memorialized in the December 31, 1989, Fiduciary Agreement between Mr. Yavuz and FPM (which was controlled and directed by Mr. Adi). The full text appears in the Appendix to this opinion.

The Fiduciary Agreement describes Mr. Yavuz's investment as two assets held in trust by FPM:

-      an investment of 20 % in the share capital of Madonna BV [the predecessor of 61 MM Corp.], Curaçao at a market value of US$ 201'420.– at December 31, 1989.

-      a loan of US$ 401'880.– granted to Madonna BV, Curaçao with additional accrued interest of US$ 333'238.46 at December 31, 1989.

*Id.* at 131.  Article 2 of the Fiduciary Agreement states:

> [Yavuz] undertakes to give all the documents, information and technical assistance, that are necessary for [FPM] to perform its mandate.
>
> In particular it is agreed that [Yavuz] will release [FPM] from all obligations which have been contracted as fulfilment of the mandate according to article 1 hereinabove.

*Id.*  Article 10 contains the following choice-of-law and forum-selection provisions:

> This convention is governed by the Swiss law, in particular article 394 and following of the Swiss Code of Obligation.  Place of courts is Fribourg.

*Id.* at 133.

"Over the next several years," Mr. Yavuz received "very sporadic and sketchy reports" regarding his investment in the Tulsa property.  *Id.* at 60.  In May 1999, nearly 10 years after execution of the Fiduciary Agreement, Mr. Yavuz inquired about the status of the investment "due to the lack of transparency in reporting to him."  *Id.*  At some unspecified time after this inquiry, Mr. Adi and FPM began "corresponding via facsimile" with representatives of 61 MM Corp.

-6-

and 61 MM Ltd., for the purpose of devising a "strategy" to provide him with "misleading financial information." *Id.* Part of this strategy was to send on behalf of 61 MM Corp. a letter to Mr. Yavuz on FPM letterhead containing unspecified "false and misleading information" to convince Mr. Yavuz that he would need to pay several hundred thousand dollars "to vest his interest in the Tulsa property." *Id.*

Communications between Mr. Yavuz and the defendants about the property continued, culminating in a letter dated November 27, 2000, from FPM to Mr. Yavuz. This letter "contained false and misleading accounting data" that Mr. Adi and FPM had prepared with the cooperation of the 61 MM Corp., *id*. at 61, and demanded that Mr. Yavuz transfer $874,703 to a bank in Fribourg, Switzerland, to vest his interest in the Tulsa Property.

Also during this time, the defendants defrauded and misled Mr. Yavuz by "structuring" the finances of 61 MM Corp. (by "creating layers of affiliate corporations and entities," *id*.) so that his 20% equity interest in 61 MM Corp. and his $735,000 loan "are essentially worthless," *id*. Finally, the defendants have been selling portions of the Tulsa Property since 1997, receiving over $800,000 from sales without sharing any profits with him.

The Second Amended Petition asserted 10 claims based on the foregoing allegations:

(1) Constructive Trust—The defendants' "denial that [Mr. Yavuz] has an interest in the property," and their "structuring the corporate ownership of the property in such a fashion as to deprive him of any value in his investment in the corporate general partner," has put them "in a position of ownership of the Tulsa property which they ought not to, in equity and in good conscience, hold and enjoy," entitling him to a constructive trust on the Tulsa Property. *Id.* at 63.

(2) Restitution—The defendants were unjustly enriched by having "the use of [Mr. Yavuz's] invested funds for over twenty years . . . without properly recognizing [his] investment in the remaining Tulsa property," entitling him to restitution of $935,000 plus interest from December 31, 1989. *Id.* at 63-64.

(3) Common Law Fraud—The defendants' communications to Mr. Yavuz, "culminat[ing] in the [letter from FPM] of November 27, 2000," constituted common-law fraud entitling him to compensatory damages of $935,000 and punitive damages of at least $10,000. *Id.* at 64.

(4) Constructive Fraud—Even if "the statements made to [Mr. Yavuz] by the Defendants . . . [were] made without an actual fraudulent intent," they still "gained an advantage to the foregoing Defendants by misleading [Mr. Yavuz] to his prejudice," entitling him to damages of at least $935,000. *Id.* at 65.

(5) Breach of Implied Contract—The defendants (a) committed an implied breach of contract when they accepted his money, "entitling him to an appropriate

share in the profits, losses and assets of [defendant corporations] and/or the remaining Tulsa Property," and (b) subsequently "refus[ed] to acknowledge [Mr. Yavuz's] appropriate and proper share in the entities and/or property," again entitling him to damages of at least $935,000. *Id.* at 65-66.

(6) Civil Conspiracy—The defendants conspired to obtain $935,000 from Mr. Yavuz through false and fraudulent statements and their acts in structuring the investment transaction so that his investment would be worthless. He requests compensatory damages of $935,000, and punitive damages of not less than $10,000. *Id.* at 66.

(7) Breach of Fiduciary Duty—The defendants breached their fiduciary duty to Mr. Yavuz with respect to his investment "based upon the facts set forth as aforesaid." *Id.* at 67. On this claim he requests damages "to the extent of the amount of his investment with them," and punitive damages of not less than $10,000. *Id.*

(8) Embezzlement—Mr. Yavuz deposited "several hundred thousand dollars to be used for various purposes, including the investment in the Tulsa Property," and the defendants embezzled from him by "appropriat[ing] the sum of $230,000 of [his] funds for their own use." *Id.* at 68. He seeks compensatory damages of $230,000, and punitive damages of at least $10,000.

(9) RICO—The defendants violated RICO by (1) furnishing false and misleading financial information and (2) diverting to foreign entities controlled by Adi and FPM certain funds that should have been used to repay Mr. Yavuz's investments. The "racketeering enterprise" consists of 61 MM Corp. "and the various foreign entities who are in an affiliate position or in a position of control of 61 MM Corp." *Id.* at 69. "The predicate acts performed by the above named Defendants which form the basis for the racketeering activity, are numerous communications between the RICO Defendants . . . [and] the Plaintiff . . . denying his request for accurate accounting information, the furnishing to him of false and incomplete financial information and the requirement that he pay exorbitant sums of several hundred thousand dollars in order to vest his investment." *Id.* at 70. He seeks $935,000 in damages, to be trebled under RICO.

(10) Accounting—Mr. Yavuz requests an accounting "as to all financial aspects of his investment in the Tulsa property and/or in the above named entities, including complete information regarding the investment of all other partners or shareholders of those entities since the inception of those entities." *Id.* at 72.

The 61 MM Defendants filed their answer to the Second Amended Petition on August 18, 2003, and asserted a counterclaim against Mr. Yavuz for alleged abuse of process. They then removed the case to federal district court on August 28.

**B.      Motion to Dismiss**

On November 25, 2003, Mr. Adi and FPM responded to the Second

Amended Petition by filing a motion to dismiss on the grounds of improper venue,

forum non conveniens, and failure to state a claim upon which relief can be

granted.  Mr. Yavuz filed his response on December 23, 2003.  The 61 MM

Defendants (who had not previously raised improper venue in their answer or a

motion) filed a document on January 30, 2004, stating that they had no objection

to the motion to dismiss.

On September 1, 2004, the district court granted the motion to dismiss on

the basis of improper venue.  The district court observed that all claims in the

dispute arose from Mr. Yavuz's investment relationship with Mr. Adi and FPM,

which was governed by the Fiduciary Agreement.  It stated that Fribourg,

Switzerland, would be a more appropriate forum for the dispute than Tulsa,

Oklahoma, because "the only connection these parties have to Tulsa, Oklahoma is

that one or more of the Defendants own real estate here and Yavuz is attempting

to use this proceeding as a prejudgment attachment of the real estate." *Id.* at 199.

The court continued:

> The Agreement was negotiated and executed in Switzerland and
> witnesses with knowledge of the Agreement are going to be located
> in Switzerland.  At the time of the execution of the Agreement, both
> Adi and FPM were residents of Switzerland.  FPM is still located in
> Switzerland and Adi is a resident of Syria, although he is still a
> citizen of Switzerland and frequently travels to Switzerland.  Yavuz

-11-

is a citizen of Turkey and litigation in Switzerland is going to be much more convenient than litigation in Tulsa, Oklahoma. Furthermore, there is litigation between these parties and regarding the Agreement which is currently pending in Fourth Circuit Sarine Ward, Fribourg, Switzerland. The Court finds that the forum selection clause in the Agreement is valid and should be honored [citing cases]. The disputes between the parties to this action should be litigated in Switzerland, not Tulsa, Oklahoma.

*Id.* at 199-200. The district court's order dismissed the case for improper venue "as [to] all Defendants," *id.* at 200, even though the 61 MM Defendants had not joined the motion or otherwise sought dismissal of the suit, and indeed had asserted a counterclaim against Mr. Yavuz. In addition, the order stated:

This Order shall also act as a dismissal of any *lis pendens* notices that have been filed with the records of the County Clerk of Tulsa County regarding this lawsuit. The Plaintiff is hereby ORDERED to execute any documents reasonabl[y] necessary to remove this lawsuit as a cloud on the title to any Tulsa County real estate owned by the Defendants.

*Id.*

Mr. Yavuz filed a motion under Fed. R. Civ. P. 60(a) on September 9, 2004. The motion asked the district court to clarify whether it had dismissed the case "as to all Defendants" and whether it had dismissed the case in its entirety, including the 61 MM Defendants' counterclaim against him. *Id.* at 202. Also, it protested that the court had not described the documents he was to execute. Mr. Yavuz then filed a timely notice of appeal on September 30. On October 25 we issued an order abating the appeal pending resolution of the Rule 60 motion.

The court entered an order on November 2, 2004, stating that it had indeed dismissed all claims and the counterclaim of the 61 MM Defendants. The order did not clarify what documents were to be executed. Mr. Yavuz filed a motion to vacate this order on November 10, and filed a timely notice of appeal from the November 2 order on December 2, 2004. We consolidated the two pending appeals. On August 8, 2005, the district court denied Mr. Yavuz's motion to vacate its order. Mr. Yavuz then filed a notice of appeal from that denial on September 1, 2005. This opinion will dispose of all three appeals.

## II. DISCUSSION

### A. Forum Non Conveniens

The parties devote substantial portions of their briefs to debating whether the district court's dismissal can be affirmed under the doctrine of forum non conveniens. We hold, however, that the court did not rule on that ground, and it would be inappropriate for us to address the matter in the first instance.

As the Supreme Court has stated:

> Under the federal doctrine of *forum non conveniens*, when an alternative forum has jurisdiction to hear a case, and when trial in the chosen forum would establish oppressiveness and vexation to a defendant out of all proportion to the plaintiff's convenience, or when the chosen forum is inappropriate because of considerations affecting the court's own administrative and legal problems, the court may, in the exercise of its sound discretion, dismiss the case, even if jurisdiction and proper venue are established.

-13-

*Am. Dredging Co. v. Miller*, 510 U.S. 443, 447-48 (1994) (internal quotation marks, brackets, and ellipses omitted). In our circuit, *Gschwind v. Cessna Aircraft Co.*, 161 F.3d 602 (10th Cir. 1998), sets forth the manner in which this determination must be made. "There are two threshold questions in the *forum non conveniens* determination: first, whether there is an adequate alternative forum in which the defendant is amenable to process, and second, whether foreign law applies." *Id.* at 605 (internal citation omitted). If both questions are answered affirmatively, "the court goes on to weigh the private and public interests bearing on the *forum non conveniens* decision." *Id.* at 606. The factors relating to private interests are:

> (1) the relative ease of access to sources of proof; (2) availability of compulsory process for compelling attendance of witnesses; (3) cost of obtaining attendance of willing non-party witnesses; (4) possibility of a view of the premises, if appropriate; and (5) all other practical problems that make trial of the case easy, expeditious and inexpensive.

*Id.* Included in the public-interest factors are:

> (1) administrative difficulties of courts with congested dockets which can be caused by cases not being filed at their place of origin; (2) the burden of jury duty on members of a community with no connection to the litigation; (3) the local interest in having localized controversies decided at home; and (4) the appropriateness of having diversity cases tried in a forum that is familiar with the governing law.

*Id.* Although there is ordinarily a "strong presumption in favor of hearing the case in the plaintiff's chosen forum," a foreign plaintiff's choice of forum

-14-

"warrants less deference." *Id.* "When the plaintiff is foreign, the private and public interest factors need not so heavily favor the alternate forum." *Id.*

The district court's dismissal order noted some of the factors relevant to application of the doctrine of forum non conveniens. It recited that Switzerland had the most significant contacts with the parties and the transactions at issue; that the Fiduciary Agreement was negotiated and signed in Switzerland; that witnesses with knowledge of the Fiduciary Agreement "are going to be located in Switzerland"; that some of the parties are Swiss residents, and that Mr. Yavuz resides in Turkey, which is closer to Switzerland than Tulsa; and that litigation between the parties has already commenced in Fribourg. Aplt. App. at 199-200. After reciting these factors, however, the district court's ruling was: "The Court finds that the forum selection clause in the Agreement is valid and should be honored. The disputes between the parties to this action should be litigated in Switzerland, not Tulsa, Oklahoma. The Motion to Dismiss of Adi and FPM is GRANTED as [to] all Defendants and this case is hereby DISMISSED pursuant to Rule 12(b)(3) of the Fed. R. Civ. P." *Id*. (internal citations omitted).

The Order does not cite any caselaw regarding the doctrine of forum non conveniens, nor do the words "forum non conveniens" appear. Several of the relevant factors are not mentioned in the order, and the district court did not engage in the requisite balancing of interests. Although there may be some merit

-15-

in resolving this issue on appeal, we believe the better practice is for the district court to make the initial ruling. *See Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1238 (10th Cir. 2005) ("Where an issue has been raised, but not ruled on, proper judicial administration generally favors remand for the district court to examine the issue initially."). We therefore remand to the district court for resolution of this issue.

## B. Forum-Selection Clause

Article 10 of the Fiduciary Agreement states: "This convention is governed by the Swiss law, in particular article 394 and following of the Swiss Code of Obligation. Place of courts is Fribourg." Aplt. App. at 133. The district court interpreted the second sentence—the forum-selection provision—to require that Mr. Yavuz bring all the claims in his complaint in a Swiss court. In so ruling, the court had to resolve several subsidiary questions: (1) Is the forum-selection provision mandatory or permissive? That is, does it *require* that the claims be brought in a Swiss court, or does it simply *permit* the claims to be brought there? (2) Are all of Mr. Yavuz's claims governed by the provision, or only some? For example, perhaps the contract claims are so governed but the provision does not govern the tort or RICO claims? (3) Does the clause bind Mr. Yavuz with respect to claims against all the defendants, or with respect to only his claims against FPM, or perhaps only those against FPM and Mr. Adi?

To answer those questions, a court must first resolve a preliminary question: What law does it apply to answer them? This choice-of-law issue is one of first impression for this court, and, with the exception of a very recent decision by a district court in our circuit, *TH Agriculture & Nutrition, L.L.C. v. Ace European Group Ltd.*, 416 F. Supp. 2d 1054 (D. Kan. 2006), and one recent law-review article, it has received virtually no attention from the federal courts, or even scholars, in the context of international contracts. As stated in that recent article: "In practice, and with rare exceptions, United States courts tend not to engage in explicit choice of law analysis when determining the validity and enforceability of a given international [forum-selection clause]. Those courts tend instead to reflexively apply lex fori, even when the contract contains an explicit choice of law clause selecting the laws of another jurisdiction to govern the contract as a whole." Jacob Webb Yackee, *Choice of Law Considerations in the Validity & Enforcement of International Forum Selection Agreements: Whose Law Applies?*, 9 UCLA J. Int'l L. & Foreign Aff. 43, 67 (2004) (internal footnote omitted) (hereinafter Yackee); *see also* Linda S. Mullenix, *Another Choice of Forum, Another Choice of Law: Consensual Adjudicatory Procedure in Federal Court*, 57 Fordham L. Rev. 291, 348 (1988) ("In large measure, the scope of choice-of-law clauses combined with forum-selection clauses has not been examined in any meaningful fashion [by federal courts].") (hereinafter Mullenix).

Nevertheless, we are not without significant guidance. To begin with, when a court interprets a contract, as a general matter it applies the law that the parties selected in their contract. *See* Restatement (Second) of Conflict of Laws § 187 (hereinafter Restatement); *id*. cmt. e (1971) ("[T]he demands of certainty, predictability, and convenience dictate that, subject to some limitations, the parties shall have power to choose the applicable law."). As we stated in *Boyd Rosene & Associates v. Kansas Municipal Gas Agency*, 174 F.3d 1115, 1121 (10th Cir. 1999):

> Because conflicts of law are inevitable in a federal system, parties to a contract are empowered to and frequently do choose a particular state's law to apply to the execution and interpretation of the contract. Absent special circumstances, courts usually honor the parties' choice of law because two "prime objectives" of contract law are "to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract." Restatement § 187 cmt. e.

A forum-selection clause is part of the contract. We see no particular reason, at least in the international context, why a forum-selection clause, among the multitude of provisions in a contract, should be singled out as a provision not to be interpreted in accordance with the law chosen by the contracting parties. *See* Restatement § 204(a) (meaning of ambiguous contractual terms should be determined "in accordance with the local law of the state chosen by the parties").

On the contrary, as we are about to discuss, Supreme Court opinions in international disputes emphasize the primacy of the parties' agreement regarding

-18-

the proper forum. That agreement consists of more than just the bare words in the forum-selection provision. The words may take on different meanings depending on the law used to interpret them. Thus, when the contract contains a choice-of-law clause, a court can effectuate the parties' agreement concerning the forum only if it interprets the forum clause under the chosen law.

Turning now to the Supreme Court's view of forum-selection clauses, the Court has recognized several considerations compelling deference to the contracting parties' choice of a forum in international commercial transactions. (We note at the outset that these considerations may not have equal force, or may be limited by compelling contrary considerations, in the context of domestic disputes. *See generally* Mullenix, *supra*, at 314.) In *M/S Bremen, GmBH v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972), the Court held enforceable (absent evidence that enforcement would be unreasonable, unfair, or unjust) a contractual requirement that the London High Court of Justice be the forum for disputes regarding an agreement by a German corporation to tow an American corporation's drilling rig from Louisiana to Italy. Reversing a closely divided en banc circuit court, the opinion explained:

> For at least two decades we have witnessed an expansion of overseas commercial activities by business enterprises based in the United States. The barrier of distance that once tended to confine a business concern to a modest territory no longer does so. Here we see an American company with special expertise contracting with a foreign company to tow a complex machine thousands of miles across seas

-19-

and oceans. The expansion of American business and industry will hardly be encouraged if, notwithstanding solemn contracts, we insist on a parochial concept that all disputes must be resolved under our laws and in our courts. Absent a contract forum, the considerations relied on by the Court of Appeals would be persuasive reasons for holding an American forum convenient in the traditional sense, but in an era of expanding world trade and commerce, the absolute aspects of the doctrine of [a circuit precedent holding a forum-selection clause unenforceable] have little place and would be a heavy hand indeed on the future development of international commercial dealings by Americans. We cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts.

*Id.* at 8-9; *see also Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 537-38 (2000) (quoting portions of the above passage in speaking of "contemporary principles of international comity and commercial practice"). The Court said that its approach "accords with ancient concepts of freedom of contract and reflects an appreciation of the expanding horizons of American contractors who seek business in all parts of the world." *Bremen*, 407 U.S. at 11. "The choice of . . . forum was made in an arm's-length negotiation by experienced and sophisticated businessmen, and absent some compelling and countervailing reason it should be honored by the parties and enforced by the courts." *Id.* at 12. The opinion continued: "There are compelling reasons why a freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power, such as that involved here, should be given full effect." *Id.* at 12-13 (internal footnote omitted). "Manifestly much uncertainty and possibly

great inconvenience to both parties could arise if a suit could be maintained in any jurisdiction in which an accident might occur or if jurisdiction were left to any place where the *Bremen* or [the German corporation] might happen to be found." *Id*. at 13. Therefore,

> [t]he elimination of all such uncertainties by agreeing in advance on a forum acceptable to both parties is an indispensable element in international trade, commerce, and contracting. There is strong evidence that the forum clause was a vital part of the agreement, and it would be unrealistic to think that the parties did not conduct their negotiations, including fixing the monetary terms, with the consequences of the forum clause figuring prominently in their calculations.

*Id*. at 13-14 (internal footnote omitted).

The Supreme Court has not departed from this approach. In *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974), the Court treated "[a]n agreement to arbitrate before a specified tribunal [as], in effect, a specialized kind of forum-selection clause." The plaintiff claimed violations of United States securities laws, and the Court had held in *Wilko v. Swan*, 346 U.S. 427 (1953), that "an agreement to arbitrate could not preclude a buyer of a security from seeking a judicial remedy under the Securities Act of 1933," *Scherk*, 417 U.S. at 510. Nevertheless, the Court enforced "the agreement of the parties in this case to arbitrate any disputes arising out of their international commercial transaction." *Id*. at 519. Echoing *Bremen*, the Court wrote:

[U]ncertainty [regarding the law applicable to disputes arising out of a contract] will almost inevitably exist with respect to any contract touching two or more countries, each with its own substantive laws and conflict-of-laws rules. A contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied is, therefore, an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction. Furthermore, such a provision obviates the danger that a dispute under the agreement might be submitted to a forum hostile to the interests of one of the parties or unfamiliar with the problem area involved.

A parochial refusal by the courts of one country to enforce an international arbitration agreement would not only frustrate these purposes, but would invite unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages.

*Id.* at 516-17 (internal footnote omitted). The Court provided a specific

hypothetical instance of what could happen:

In the present case, for example, it is not inconceivable that if Scherk had anticipated that Alberto-Culver would be able in this country to enjoin resort to arbitration he might have sought an order in France or some other country enjoining Alberto-Culver from proceeding with its litigation in the United States. Whatever recognition the courts of this country might ultimately have granted to the order of the foreign court, the dicey atmosphere of such a legal no-man's-land would surely damage the fabric of international commerce and trade, and imperil the willingness and ability of businessmen to enter into international commercial agreements.

*Id.* at 517.

Similarly, a decade later in *Mitsubishi Motors Corp. v. Soler Chrysler-*

*Plymouth*, 473 U.S. 614 (1985), the Court held that the circuit court had erred in

holding that an antitrust claim was not subject to arbitration in accordance with a provision in an international commercial agreement. The Court explained:

> [W]e conclude that concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce the parties' agreement, even assuming that a contrary result would be forthcoming in a domestic context.

*Id.* at 629.

To be sure, the above Supreme Court opinions did not address the choice-of-law issue presented here. In those cases there was no question regarding the meaning of the contractual forum-selection provision at issue, only its enforceability. But the same reasoning applies: If the parties to an international contract agree on a forum-selection clause that has a particular meaning under the law of a specific jurisdiction, and the parties agree that the contract is to be interpreted under the law of that jurisdiction, then respect for the parties' autonomy and the demands of predictability in international transactions require courts to give effect to the meaning of the forum-selection clause under the chosen law, at least absent special circumstances (such as, perhaps, the chosen jurisdiction's refusal to hear a case that has no ties to the jurisdiction). *See* Yackee, *supra*, at 84-85. In other words, just as the Supreme Court has made clear that under federal law the courts should ordinarily honor an international commercial agreement's forum-selection provision, we now hold that under

-23-

federal law the courts should ordinarily honor an international commercial agreement's forum-selection provision *as construed under the law specified in the agreement's choice-of-law provision*. The practice, although apparently merely reflexive, of applying the law of the jurisdiction in which the suit is pending (*lex fori*), is unsatisfactory. As one author has expressed the point:

> Lex fori is, in most circumstances and for a number of reasons, a poor choice of law to govern an international [forum-selection clause]: it risks subjecting the contract to multiple laws, it makes it difficult for parties to anticipate at the contract drafting stage which law will actually be applied to [the forum-selection clause], it may promote forum shopping, and it ignores the parties' bargained-for jurisdictional expectations by overlooking a contract's explicit or implicit choice of law.

Yackee, *supra*, at 83 (internal footnotes omitted).

Turning to the Fiduciary Agreement, the choice-of-forum clause states: "Place of courts is Fribourg." Aplt. App. at 133. Under American law this language appears rather ambiguous. We would be inclined to hold that the clause is permissive rather than mandatory, *see K & V Scientific Co. v. Bayerische Motoren Werke Aktiengesellschaft*, 314 F.3d 494 (10th Cir. 2002), and it is hardly obvious what claims, against what parties, are governed by the clause. We might reach the same conclusions under Swiss law, but perhaps not. *See* Yackee, *supra*, at 61 (noting that European Union law presumes forum-selection clauses are exclusive). The parties have not addressed the issue.

What is not ambiguous is that the parties agreed that Swiss law governs the Fiduciary Agreement. Accordingly, we hold that the choice-of-forum provision in that contract must be construed under Swiss law. We recognize that we have some discretion to decide to determine ourselves what Swiss law provides. *See* Fed. R. Civ. P. 44.1; *Swiss Credit Bank v. Balink*, 614 F.2d 1269, 1272 (10th Cir. 1980) (applying Swiss law on appeal). But the better practice is to remand to district court to permit the parties to present the applicable law and perhaps to develop further any facts that may be relevant under that law. *See SEC v. Dunlap*, 253 F.3d 768, 777 (4th Cir. 2001) (remanding to district court with instructions to determine "what Costa Rican law actually provides, and its significance, if any, in this matter"); *Banque Paribas v. Hamilton Indus. Int'l, Inc.*, 767 F.2d 380, 386 (7th Cir. 1985) (remanding with instructions to "determine, in accordance with Rule 44.1 of the Federal Rules of Civil Procedure, whether there was any violation of the guarantee, when that guarantee is interpreted in according with Saudi Arabian law"). We also note that the issue may be mooted by a determination that venue is inappropriate under the forum non conveniens doctrine.

## C.    Executing Documents

Finally, Mr. Yavuz contends that the district court erred when, as part of its order granting the motion to dismiss, it ordered him to execute documents to

remove any cloud on the title to the Tulsa Property. The district court's order

stated:

> This Order shall also act as a dismissal of any *lis pendens* notices
> that have been filed with the records of the County Clerk of Tulsa
> County regarding this lawsuit. The Plaintiff is hereby ORDERED to
> execute any documents reasonabl[y] necessary to remove <u>this lawsuit</u>
> as a cloud on the title to any Tulsa County real estate owned by the
> Defendants.

Aplt. App. at 200 (emphasis added). We are perplexed by the order. It did not

relate to any lis pendens filed by Mr. Yavuz, because all of them had been

expunged. Defendants' brief on appeal does not explain what Mr. Yavuz was to

do in response to the order or how the district court had the authority to issue the

order when it was dismissing the case. We therefore vacate the order.

## III.   CONCLUSION

We REVERSE the judgment of the district court and REMAND for further

proceedings consistent with this opinion.

-26-

## APPENDIX

_____The full text of the 1989 Agreement is as follows:

## FIDUCIARY AGREEMENT

between

Orhan YAVUZ
Cumhuryet Caddesi 20/6
Taksim - Istanbul
Turkey

hereinafter referred to as "TRUSTOR"

and

FINASTATE SA
Rue St-Pierre 18

1700 Fribourg

hereinafter referred to as "FINASTATE"

## Article 1

TRUSTOR hereby instructs FINASTATE to acquire and to administer, in its name, but for the account and risk of TRUSTOR, the following assets:

- an investment of 20% in the share capital of Madonna BV, Curaçao at a market value of US\$ 201'420.—at December 31, 1989.
- a loan of US\$ 401'880.—granted to Madonna BV, Curaçao with additional accrued interest of US\$ 333'238.46 at December 31, 1989.

These assets, held by FINASTATE or registered in its name, in fiduciary capacity, for the account of TRUSTOR, remain the property of TRUSTOR.

TRUSTOR has, or will make available to FINASTATE, the necessary funds in order to cover the investments and the related expenses.

## Article 2

TRUSTOR undertakes to give all the documents, information and technical assistance, that are necessary for FINASTATE to perform its mandate.

In particular it is agreed that TRUSTOR will release FINASTATE from all obligations which have been contracted as fulfilment of the mandate according to article 1 hereinabove.

## Article 3

FINASTATE gives no guarantee nor takes any responsibility in respect of this operation. It is well understood that all risks of exchange and transfer as well as risks of disposal and of fiscal actions, are entirely to the charge of TRUSTOR.

## Article 4

TRUSTOR accept[s] that FINASTATE acts as trustee at the risk of TRUSTOR.

In addition, TRUSTOR releases FINASTATE, and all persons acting on behalf of FINASTATE in the execution of this agreement, from all responsibility.

TRUSTOR will indemnify FINASTATE and all persons acting on behalf of FINASTATE in the execution of this agreement, against all claims made by third parties in direct or indirect relation with the present agreement.

FINASTATE will only act on clear instructions given by TRUSTOR. In urgent circumstances, or if TRUSTOR cannot be contacted in time, FINASTATE may undertake whatever steps necessary in accordance with its judgment in order to safeguard the interests of TRUSTOR.

## Article 5

The funds deriving from the assets held through this agreement will be transferred to TRUSTOR after said funds have been cashed by FINASTATE, on the understanding that TRUSTOR will communicate to FINASTATE how payment has to be made.

In the case of FINASTATE not receiving the funds, FINASTATE transfers the claim or asset to TRUSTOR and so will be released from all other obligations.

## Article 6

TRUSTOR authorizes FINASTATE to represent the shares held as trustee at the shareholders meeting, without having in fact the obligation to use the violating rights attached to these shares according to the instructions received from TRUSTOR or according to the judgement of FINASTATE in order to safeguard the interests of TRUSTOR.

## Article 7

In consideration for carrying out this mandate, FINASTATE is entitled to a commission of 5 % per annum, calculated on the total assets held as trustee at market value.

## Article 8

FINASTATE is authorized to communicate the existence of this agreement to the competent fiscal authorities, if duly requested by them. FINASTATE is also authorized to give a detailed list of the assets held in fiduciary capacity on behalf of TRUSTOR.

## Article 9

This agreement may be cancelled at any time, without mention of the reason, by both parties, with notice of one month to be given by registered mail to the address of the other party as per this agreement.

In such a case, on condition that the claim of FINASTATE against TRUSTOR is completed, FINASTATE will transfer the assets as per article 1 with all attached rights to TRUSTOR, or to another person nominated by TRUSTOR, by giving the related documentation or title and against declaration of release.

The notice to this contract will not affect transactions which are in progress.

## Article 10

This convention is governed by the Swiss law, in particular article 394 and following of the Swiss Code of Obligation. Place of courts is Fribourg.

Fribourg, December 31, 1989

Orhan YAVUZ                         FINASTATE SA
/s/                                      /s/

Aplt. App. at 131-33.