**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 9, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

NANCY KORNFELD; MEREDITH
KORNFELD,

Plaintiffs-Counter-
Defendants-Appellees,

v.

JULIAN KORNFELD; PATSY D.
PERMENTER, individually and as
co-trustees of Julian P. Kornfeld
Revocable Trust,

Defendants-Counter-
Claimants-Appellants.

No. 08-6131
(D.C. No. 5:07-CV-00438-L)
(W.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **McCONNELL**, **McKAY**, and **GORSUCH**, Circuit Judges.

---

This case involves a dispute over the ownership of stock in a closely held

corporation. The matter was decided on cross-motions for summary judgment,

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

and Julian Kornfeld and Patsy D. Permenter, individually and as co-trustees of the Julian P. Kornfeld Revocable Trust, have appealed the district court's judgment. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

**I**

Julian Kornfeld (Julian), an attorney, established a corporation in 1972 that eventually became known as the Mernan Royalty Corporation (MRC). Ms. Permenter served as Julian's administrative assistant. MRC's assets consisted of oil and gas royalties, overriding royalty interests, and other interests. Julian owned 100% of MRC's stock until 1987, when he transferred all MRC stock to his two daughters, Meredith Kornfeld and Nancy Kornfeld, appellees here, in exchange for a private annuity to commence in 2015. Meredith and Nancy each received 5,000 shares of MRC voting common stock, but at the time, Julian did not deliver any stock certificates to them.[1] He continued on as MRC's president and, along with Ms. Permenter, the two managed the company and maintained corporate records until their resignation in 2006. Although Meredith and Nancy often signed corporate paperwork provided to them by their father, neither had any meaningful involvement with MRC's operation during Julian's tenure as its president.

---

[1] Although Julian also transferred all of his preferred, nonvoting stock, that stock is not at issue in this case. All references to "shares" are to MRC's voting common stock.

-2-

Meanwhile, in 1990, MRC created an employee stock ownership plan (ESOP) with Julian as its sole trustee. MRC issued and contributed shares of its voting common stock into the ESOP until 1996. At that time, the ESOP held a total of 2,956.41 shares (22.82%), and Meredith and Nancy each held 5,000 shares (38.59% each).

In 1999, Julian signed an agreement of merger on behalf of MRC. In exchange for $225,000, MRC issued 2,963.47 shares of its voting common stock to the Alfred D. Goldman SNR-1 Trust in February 1999, and 7,260.82 shares to the Estate of Alfred D. Goldman in June 1999. The cash involved represented fees owed to Julian for services as trustee of the Goldman Trust and executor of the Goldman Estate. In November 1999, MRC issued 75.5 shares of its voting common stock to each of Julian's daughters. At that point, the ownership of voting common stock in terms of percentages was as follows: Goldman Estate, 31.12%; Goldman SNR-1 Trust, 12.70%; Meredith, 21.75%; Nancy, 21.75%; and the ESOP, 12.67%.[2]

It appears that Julian did not inform Meredith or Nancy about the Goldman merger at the time, and when they became aware of it, things turned litigious. However, the parties, together with MRC and Jeannie Mitschke, who is Julian's wife, entered a settlement agreement in 2004. Among other things, the agreement amended joint purchase agreements that Meredith, Nancy, Julian, and

---

[2]    Percentages have been rounded and do not total 100%.

Ms. Permenter had entered into for the purchase of bonds and stock: Ms. Permenter agreed to convey to Meredith and Nancy her remainder interests, and Meredith and Nancy agreed that upon Julian's death, a life estate in the income stream from those investments would be payable to Julian's wife, Jeannie, rather than to them. The settlement agreement also provided (1) for the termination of Julian's deferred private annuity; (2) for MRC's redemption and cancellation of the stock issued in the Goldman merger; and (3) terms for Julian to repay loans he obtained from MRC on which he was in default. Paragraph 3.3.2 of the agreement pertained to the redemption and cancellation of the Goldman shares and is at the heart of this appeal. It stated that MRC would "evidence the payment to Julian, as executor and trustee of the Goldman Entities, the $225,000 in redemption and cancellation of all of [sic] shares of stock of MRC held by the Goldman Entities, restoring Meredith and Nan[cy] as the rightful owners of the [voting common] stock of MRC, as follows:" Meredith 43.66%; Nancy 43.66%; and the MRC ESOP 12.67%. Julian provided stock certificates to Meredith and Nancy for the first time when the parties met to sign the settlement agreement in September 2004.

In 2006, Meredith and Nancy entered into an agreement to sell all of MRC's stock. When informed of the pending sale, Julian argued that the ESOP owned 22.55% of MRC voting common stock, not the 12.67% stated in the settlement agreement. He further contended that he owned 49.75% of the ESOP's

-4-

shares and that Ms. Permenter owned 11.21%. Meredith and Nancy maintained that the ESOP owned only 12.67%, as stated in the settlement agreement, and that nothing in the settlement agreement set out the ownership of the ESOP shares.

The sale of MRC went through in December 2006 for $800,000, but the buyers deposited $109,998 of the purchase price into an escrow account, to be distributed once the parties sorted out their dispute regarding the ESOP's shares. That sum represented the maximum amount to which Julian and Ms. Permenter claimed entitlement under their theory of ESOP ownership.

Several months later, Meredith and Nancy filed the underlying diversity action seeking a declaratory judgment regarding the ESOP shares and damages for breach of the settlement agreement. Julian and Ms. Permenter filed a counterclaim requesting a declaratory judgment in their favor. After the parties filed cross-motions for summary judgment, the district court issued two primary rulings on the merits, the second of which came after supplemental briefing and a hearing: (1) that the ESOP owned 12.67% of MRC voting common stock, as stated in the settlement agreement, because any mistake was unilateral on the part of Julian, not a mutual mistake; and (2) that based on the credible evidence of their compensation in the years that MRC contributed stock to the ESOP, Julian, Meredith, and Nancy each owned 33.33% of the ESOP's shares, and Ms. Permenter owned no ESOP shares. The court also denied appellants' motion to reconsider its first ruling. This appeal followed.

## II

Appellants challenge each of the district court's merits rulings. Because this case was decided on summary judgment, our task is to review the district court's decisions de novo, applying the same substantive legal standards. *See Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

### A. The ESOP's ownership of MRC voting common stock

Regarding the district court's ruling that, as stated in the settlement agreement, the ESOP owned 12.67% of MRC's voting common stock, the central thrust of appellants' argument is that, after redemption and cancellation of the Goldman shares, the parties stood in the same position as they did prior to the Goldman merger: Meredith and Nancy each owned 5,075.5 shares of MRC voting common stock, which equates to 38.72% each, and the ESOP owned 2,956.41 shares, which equates to 22.55%. In support, appellants advance a number of sub-arguments that can be summarized as follows: (1) the redemption and cancellation of the Goldman stock was the main purpose of the settlement agreement, and the "correct operation" of a "normal" redemption and cancellation is that the percentage of ownership of the remaining shareholders increases

-6-

proportionally, Aplt. Br. at 20; (2) the 12.67% figure in ¶ 3.3.2, inserted by opposing counsel during the exchange of drafts of the settlement agreement, is a scrivener's error constituting a mutual mistake that merits reformation of the parties' agreement; (3) the ESOP is a "trust and separate legal entity" and was not a signatory to the settlement agreement, so it cannot be forced to "divest" its shares, which is the practical result of giving effect to the 12.67% figure, *id.* at 13; (4) the ESOP's stock is specifically excepted from the terms of the settlement agreement by ¶ 3.6.7; and (5) the stock certificates, which support appellants' position regarding the number of shares owned by Meredith, Nancy, and the ESOP, are prima facie evidence of ownership.

We are not persuaded by any of these arguments. First, while we might agree in theory that the "correct operation" of a "normal" redemption and cancellation of stock ordinarily results in an increase in the ownership of the remaining shareholders when viewed as a percentage, the settlement agreement is not a normal redemption and cancellation. The parties resolved a number of other disputes, summarized above, and expressly agreed in writing to a different percentage of ownership than might result from a "normal" redemption and cancellation.

Second, assuming it was appellees' counsel who inserted the 12.67% figure in an early draft of the settlement agreement, appellants have not met their burden of proving that this was a scrivener's error amounting to a mutual mistake of fact

that justifies reformation.  Under Oklahoma law,[3] "[m]utual mistake requires both parties to labor under the same misconception as to the facts," *Hoobler v. Hanson (In re Hoobler)*, 925 P.2d 13, 14 n.1 (Okla. 1996), and "[r]eformation corrects a mistake between the written document and the actual intent of the contracting parties," *Okla. Oncology & Hematology P.C. v. US Oncology, Inc.*, 160 P.3d 936, 947 n.22 (Okla. 2007).  To prevail on a theory of mutual mistake, a party must provide "clear and convincing evidence" that the contract "does not reflect what either party intended."  *Thompson v. Estate of Coffield*, 894 P.2d 1065, 1067-68 (Okla. 1995).  Here, the numerous drafts of the agreement contained in the record show that Julian proposed many changes, including to ¶ 3.3, but no changes with regard to the 12.67% figure of ¶ 3.3.2 contained in almost every draft.  Nothing indicates that appellees' counsel inserted that figure based on a misconception shared with appellants as to how the ownership of MRC's voting common stock would be allocated among Meredith, Nancy, and the ESOP after the parties settled their disputes.  Indeed, at the hearing,[4] Nancy testified that during the

---

[3]     In the settlement agreement, the parties agreed that Oklahoma law governs any disputes regarding the validity, construction, and enforcement of the settlement agreement, so we apply the substantive law of Oklahoma.  *Cf. Yavuz v. 61 MM, Ltd.*, 465 F.3d 418, 428 (10th Cir. 2006) ("Absent special circumstances, courts usually honor the parties' [contractual] choice of law . . . .") (quotation omitted).

[4]     Although the hearing occurred after the district court's first order concerning the ESOP's ownership of MRC stock, the court still had pending before it appellants' motion to reconsider.  Therefore, Nancy's testimony is

(continued...)

negotiations leading up to the settlement agreement, Julian consistently represented that she and Meredith would have total ownership of MRC, including through stock held by the ESOP. *See* Aplee. Supp. App. at 151. This view is supported by a statement of the parties' intent in ¶ 3.2.1 of the settlement agreement concerning the termination of Julian's deferred annuity: that "Meredith and Nan[cy] are to own 100% of the stock of MRC without any further obligation to Julian." Aplt. App., Vol. I at 49. Nancy also stated that a material purpose of the settlement agreement was to restore Meredith and her to complete ownership of MRC because Julian was asking them to forfeit their rights to the income stream on $2 million worth of bonds in favor of Julian's wife, Jeannie. *See* Aplee. Supp. App. at 150. Accordingly, we conclude that appellants have not provided clear and convincing proof that the 12.67% figure was a mutual mistake. Any "mistake" as to the 12.67% figure stems from appellants' failure to take issue with that term of the agreement if they disagreed with it, not from a mutual mistake.

Next, although true that the ESOP was not a party to the settlement agreement, we do not think appellants may rely on an allegation that the ESOP was a trust and separate legal entity in order to avoid the effect of the settlement agreement on the ESOP's percentage of ownership of MRC's voting common

---

[4](...continued)
relevant to the assertion of mutual mistake.

stock. The district court struck the only ESOP document—four pages of a plan appellants claimed was fifty-eight pages in length, which they submitted during summary judgment briefing—on the ground that appellants failed to disclose it during discovery. Appellants have not contested this evidentiary ruling on appeal. Thus, regardless of the parties' apparent agreement that an ESOP existed, there is simply no record proof regarding its legal status. Because of this, as well as the fact that all individuals with any interest in MRC or the ESOP were signatories to the settlement agreement, we conclude that appellants may not rely on the fact that the ESOP was not a signatory in order to escape the consequences of their agreement that the ESOP would own 12.67% of MRC's voting common stock.

This conclusion is buttressed by the parties' reference to the ESOP in ¶ 3.6.7 of the settlement agreement, which provides:

> Julian shall not, through any action (directly or indirectly) of Julian, permit Meredith and Nan[cy] as MRC's current shareholders to at any time own, legally or beneficially, less than 100% of the aggregate interest of all classes of capital stock or equity interests of MRC and Meredith and Nan[cy] shall at all times own at least 100% of the aggregate interests of all classes of capital stock of MRC, except for any shares of stock owned by the MRC Employee Stock Ownership Plan.

Aplt. App., Vol. I at 52. By this provision, the parties asserted the ESOP's interest despite the fact that it was not a party to the agreement. But contrary to appellants' contention, the last clause of ¶ 3.6.7 does not "except" the ESOP's

shares from the terms of the settlement agreement such that the designation of 12.67% is ineffective. Rather, it merely states the obvious: that Meredith and Nancy would not individually own any stock owned by the ESOP.

Finally, appellants argue that the stock certificates of record show that of a total of 13,107.41 shares, Meredith and Nancy each own 5,075.5 shares and the ESOP owns 2,956.41 shares. Based on the stock certificates, appellants contend that the ESOP owns 22.55%, and that the 12.67% in the settlement agreement is a "mathematical impossibility." Aplt. Br. at 17. We disagree. Under Oklahoma law, "[a] stock certificate is but prima facie evidence of ownership in the person to whom issued, and is not conclusive and the facts as to the true ownership may be shown, unless estoppel prevents." *Davis v. Nat'l Bank of Tulsa*, 353 P.2d 482, 486 (Okla. 1960) (quotation omitted).[5] Here, the settlement agreement sets out ownership of MRC stock that conflicts with the stock certificates. As an express agreement entered into by the parties after issuance of the stock, the agreement constitutes contrary proof of ownership. *Cf. Kirkpatrick v. Jacobson's Lifetime Bldgs., Inc.*, 467 P.2d 489, 490-91 (Okla. 1970) (concluding that evidence of agreement to pay part of the purchase price of a house with stock was among

---

[5] Although appellants read *Davis* to require "substantial proof to the contrary," Aplt. Br. at 16, we fail to see such a directive in *Davis* or any other case applying Oklahoma law. But even if it were a requirement, our conclusion would remain the same.

other ample evidence to rebut prima facie evidence of ownership by possession of stock certificate).[6]

In sum, we conclude that according to the express terms of the settlement agreement, the ESOP owns 12.67% of MRC's voting common stock.

**B.  The parties' ownership of ESOP shares**

Appellants raise several arguments regarding the district court's ruling that, based on evidence of their compensation, Meredith, Nancy, and Julian each own 33.33% of the ESOP's shares of MRC voting common stock and that Ms. Permenter owns none.  They first take issue with the district court's evidentiary ruling concerning an "allocation record" Julian had prepared.  The allocation record contained a summary of compensation for the years 1990-96 and indicated the number of ESOP shares allocated to each of the parties in proportion to compensation during the year of contribution:  49.74% to Julian; 11.21% to Ms. Permenter; 19.52% to Meredith; and 19.52% to Nancy.[7]  As to its genesis, Julian testified:

---

[6]     Appellants also argue that the stock certificates establish ownership of the shares because appellees did not dispute Undisputed Fact No. 7 of appellants' motion for summary judgment, which set out the date of contribution, stock certificate number, and number of shares issued to the ESOP.  We reject this argument, as appellees responded they "have no knowledge or information sufficient to admit or deny the allegations of" that fact.  Aplt. App., Vol. IV at 1004, ¶ 3.

[7]     The parties appear to agree that ownership of the ESOP shares is proportional to their compensation during the years in which MRC issued shares to the ESOP.

It was prepared a long time ago. I don't know exactly when it was prepared. We had it in the records of the ESOP, because we had to keep on an annual basis the records of how many shares were allocated to the participants, which was always proportionate to the compensation of the participants.

Aplee. Supp. App. at 59. Julian also stated that he discarded the underlying compensation records for the years at issue because it was his practice to do so once the statute of limitations under the Internal Revenue Code had run.

The district court ruled that the allocation record was hearsay under Fed. R. Evid. 801 and not within the exception to the hearsay rule for records of a regularly conducted activity, Fed. R. Evid. 803(6), because Julian could not say when it was prepared and because the circumstances of its preparation, including the fact that there was no credible supporting evidence regarding compensation claims for certain years, indicated a lack of trustworthiness. The court also noted that Julian's testimony regarding bonuses he received in 1990 and 1992 was "flatly contradicted" by his earlier admission that from 1989 until 2002, he had taken no salary or compensation from MRC other than $100 per month. Aplt. App., Vol. IV at 1373 (citing to a memorandum Julian sent to Meredith and Nancy in 2003 during negotiations leading up to the settlement agreement).

We review evidentiary rulings for abuse of discretion. *Abuan v. Level 3 Commc'ns, Inc.*, 353 F.3d 1158, 1171 (10th Cir. 2003). We conclude that the district court did not abuse its discretion in excluding the allocation record as hearsay. Contrary to appellants' first contention, which unsurprisingly is

-13-

supported by no case citation, the fact that Julian authored the document and authenticated it by affidavit and testimony does not render it nonhearsay. "'Hearsay' is a statement, *other than one made by the declarant while testifying at the trial or hearing*, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c) (emphasis added). The allocation record fits within this definition. It is a statement made by Julian, the declarant, *other than while testifying at the hearing*; it was offered to prove the truth of the matter it asserts; and it does not fall within any of the definitions of nonhearsay set out in Rule 801(d). Consequently, it is hearsay.

Moving to the district court's ruling that the allocation record did not qualify as a record of a regularly conducted activity excepted from the hearsay rule under Rule 803(6), appellants focus on whether the allocation record was "kept in the course of a regularly conducted business activity" and "made at or near the time" of the events recorded, both requirements under the rule. But they fail to address the court's reliance on the rule's exclusion of such records if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Fed. R. Evid. 803(6). Thus, even assuming that the allocation record meets the other requirements of Rule 803(6), appellants have waived any argument regarding the district court's view that it lacked

trustworthiness.  *See State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7

(10th Cir. 1994) (deeming waived issue not raised in opening brief).[8]

Appellants also argue that the district court's reliance on Nancy's testimony

regarding compensation was improper because the testimony lacked

foundation—Nancy admitted she had little or no knowledge of how MRC was

run, yet testified that she, Meredith, and Julian were paid a salary of $100 per

month for the years in question.  Foundation requires a witness to have personal

knowledge of matters about which she testifies.  *See United States v. Nieto*,

60 F.3d 1464, 1468 (10th Cir. 1995).  Obviously, Nancy had personal knowledge

of her own compensation.  With regard to Meredith's compensation, the problem

with appellants' argument is that the evidence they would have us consider

instead, the allocation record, shows that Meredith received $10,000 in 1990, and

$1,200 (i.e., $100 per month) in 1991, 1992, 1995, and 1996.[9]  Since Nancy's

testimony is essentially consistent with appellants' own position, and appellants

have not advanced any argument or cited to any evidence that Meredith's

---

[8]     Appellants maintain that because appellees did not object to the allocation
record when it was presented with the counterclaim or to its admission at the
hearing, the facts it represents are deemed admitted.  These arguments are clearly
belied by the record.  In their reply to the counterclaim, appellees denied the
allegations contained in ¶ 9 of the counterclaim, which summarized the allocation
record, *see* Aplee. Supp. App. at 1 ¶ 8, and challenged the veracity of the
allocation record at the hearing during direct examination of Julian, *see id.*
at 58:22 to 61:6; 64:13-18.

[9]     The allocation record does not show compensation for the years 1993 and
1994, apparently because no shares were issued to the ESOP in those years.

compensation was less than $100 per month for the years in question, we think it inequitable for appellants to now dispute Meredith's compensation by challenging the foundation of Nancy's testimony. Finally, Nancy's testimony that Julian earned $100 per month for the years at issue was based on the admission Julian made in the memorandum he sent to his daughters in 2003 that the court deemed inconsistent with Julian's claim to having received greater compensation. Thus, foundation is not at issue with regard to Nancy's personal knowledge of Julian's compensation, and contrary to appellants' reply-brief contention, admissions of party-opponents are not hearsay. *See* Fed. R. Evid. 801(d)(2). Thus, we see no reversible error in the district court's reliance on Nancy's testimony.

With regard to Ms. Permenter's ownership of ESOP shares, the allocation record is the only evidence of her compensation for the years in question. As we have upheld the district court's ruling that the allocation record is hearsay, and appellants presented no other evidence of her compensation, we conclude the court correctly determined that she was entitled to no percentage of the escrowed funds.

For their last point, appellants argue that together, Meredith and Nancy are limited to no more than 50% of the escrowed funds because they never sought more than that amount in any papers filed with the court until they filed a supplemental brief just prior to the hearing on their ESOP ownership, when they asked for 100%. We are not persuaded, as appellees prayed in their amended

complaint for whatever additional legal or equitable relief they might be entitled to.

The judgment of the district court is AFFIRMED.

Entered for the Court


Neil M. Gorsuch
Circuit Judge