2007 OK 12

**OKLAHOMA ONCOLOGY & HEMATOL-OGY P.C., an Oklahoma Professional Corporation, d/b/a Cancer Care Associates, Appellant,**

v.

**US ONCOLOGY, INC., a Delaware Corporation, and AOR Management Company of Oklahoma, Inc., a Delaware Corporation, Appellees.**

Nos. 102,673, 102,612.

Supreme Court of Oklahoma.

March 15, 2007.

938

Lana Jeanne Tyree, Cartwright & Tyree, Oklahoma City, Oklahoma, and John H. Tucker, Rhodes, Hieronymus, Jones, Tucker & Gable, PLLC, Tulsa, Oklahoma, for appellant.

James M. Sturdivant and Timothy A. Carnery, Gable & Gotwals, Tulsa, Oklahoma, for appellees.

TAYLOR, J.

¶ 1 The basic question in this appeal and the consolidated original action is whether the district court erred in sending all claims in this suit to arbitration. We find the district court erred in compelling arbitration and reverse the arbitration order. We remand this case to the district court with instructions.

## I. The Proceedings Below

¶ 2 The following are basic facts gleaned from the district court filings and the arguments in this Court.[1] Plaintiff/appellant, Oklahoma Oncology & Hematology P.C., d/b/a Cancer Care Associates (CCA), is an Oklahoma professional corporation of Oklahoma-licensed physicians who engage in the practice of medical oncology, hematology, and radiation oncology throughout the state of Oklahoma. CCA has more than sixty full-time, part-time, and contract physicians, and it has offices in Tulsa, Oklahoma City, Norman, Bartlesville, McAlester, Muskogee, Pryor, Enid, Vinita, and Stillwater.

¶ 3 Defendant/appellee AOR Management Company of Oklahoma, Inc. (AOR–OK) is a Delaware corporation incorporated in 1995 to provide business management services in Oklahoma to CCA. AOR–OK was a wholly-owned subsidiary of American Oncology Resources, Inc. (AOR) until it became a wholly-owned subsidiary of defendant/appellee U.S. Oncology, Inc. (USON) in 1999.[2] Since its inception, AOR–OK has maintained its corporate office in the offices of CCA in Tulsa, Oklahoma.

¶ 4 This controversy has its origin in a business transaction that occurred in 1995, whereby AOR–OK became the business manager for the oncology medical practices of the CCA physicians. The transactional documents executed in March, 1995, included the Management Services Agreement (MSA) between CCA and Oncology and Hematology Management Partnership, a Texas General Partnership (the Texas partnership) and a Purchase Agreement executed by AOR, AOR–OK, CCA, Oklahoma Oncology & Hematology P.C., and more than fifteen physicians.

¶ 5 The MSA is the central contract in this controversy. The MSA was executed by only one person, Alan M. Keller, M.D., a CCA physician. Dr. Keller executed the agreement both on behalf of the Texas general partnership and on behalf of CCA.[3]

1. The parties have not stipulated to the basic facts set out in this opinion, and on remand these facts may be contested.

2. The appellate record indicates that, in 1995, there were two oncology management companies with the expertise to be the business manager for groups of physicians with oncology medical practices. They were Physician Reliance Network, Inc. (PRN) located in Dallas Texas, and AOR located in Houston, Texas. In 1999, AOR and PRN merged and became USON. USON is a Delaware corporation located in Houston, Texas. USON is not registered to do business in Oklahoma.

3. The record contains an affidavit of Dr. Keller stating that he has been a licensed physician in Oklahoma since 1978, he is a physician with CCA, he was a shareholder and president of the predecessor to CCA, and he signed the MSA on behalf of the physicians at CCA by virtue of limited powers of attorney drafted by AOR. The affidavit does not provide any information as to this Oklahoma physician's representation of the Texas partnership. The affidavit does state that the transaction documents were drafted by AOR and that AOR was unwilling to negotiate the terms of the documents because they "were intended to be standardized agreements that needed to be uniform between practices they managed." Apparently, Dr. Keller's representation of the Texas partnership was at the behest of AOR.

Even though it is a contract between CCA and the Texas partnership, the MSA provided for AOR to succeed to all the rights and obligations of the Texas partnership thereunder, it directed AOR to assign its rights and obligations under the MSA to AOR–OK, and it designated AOR–OK as the business manager for CCA.[4]

¶ 6 The MSA prescribed the duties and obligations of CCA and AOR–OK for the business management of the oncology medical practices of the CCA physicians. The MSA has a forty-year term with automatic renewal every five years thereafter. The MSA fixed AOR–OK's business management fees for the first five years at a "monthly fee" in the amount equal to the "fixed amount" plus seven percent of the adjusted gross revenue. The "fixed amount" for the first sixty months ranged from $325,890 to $359,013 under the schedule in the MSA. However, the "fixed amount" was increased by several amendments to the MSA. The first amendment was in January of 1997 and the last was in October of 1999. Each amendment was in writing and executed on behalf of AOR–OK and CCA. After the first five years, the MSA provided for a "monthly fee" equal to 24.7% of the adjusted gross revenue.[5]

¶ 7 The working relationship between CCA and AOR–OK during the first five years apparently disintegrated after USON became the parent corporation of AOR–OK. According to CCA, USON has taken control of CCA's administrative and financial business, its money and accounts, and its books and records. On January 26, 2005, CCA notified AOR–OK that it considered the MSA to be illegal, against public policy, and void *ab initio* under Oklahoma law. Two days later, on January 28, 2005, AOR–OK filed an arbitration complaint asking that the business management fee provisions in the MSA be reformed.

¶ 8 In the arbitration complaint, AOR–OK alleged that 1) macro-economic changes in the cancer care industry during the past several years resulted in a substantially lower business management fee for AOR–OK, 2) CCA and AOR–OK have been unable to agree to any changes in the business management fee since 1999, and 3) AOR–OK resigned itself to fulfilling the MSA for substantially less profit than had been anticipated. It further alleged that the change in reimbursement rates in the Medicaid Modernization Act of 2003 directly impacts the amount of the business management fee in the MSA.

¶ 9 The arbitration complaint referred to section 7.2(d) of the MSA as authorizing arbitration for the purpose of rewriting the business management fee provisions in the MSA. Section 7.2(d) provides for the parties to negotiate in good faith concerning a new service arrangement or a new basis for compensation as may be necessary due to change in Medicare/Medicaid law, state law or change in any third party reimbursement system; and if the parties cannot agree to a new service arrangement or basis for compensation, it provides for the matter to be sent to binding arbitration.

4. The transactional documents executed in March, 1995, included the assignment of the MSA from AOR to AOR–OK and a special power of attorney to AOR–OK. The assignment from AOR, as successor in interest to the Texas partnership, "sold, transferred, assigned and conveyed" to AOR–OK "all revenues, payments, profits, proceeds, awards, compensation, instruments, documents, actions, causes of action, benefits, rights, refunds, monies, and property of every kind ... emanating from that one certain Management Services Agreement ... and all other rights, powers, privileges and remedies of Assignor thereunder (the 'contract rights')." The special power of attorney from CCA authorized AOR–OK to handle the billing of CCA's patient accounts and the receiving, collecting, and depositing of patient fees.

5. The MSA defined "adjusted gross revenue" as the sum of professional services revenues and ancillary revenue. It defined "professional services revenues" as all professional fees actually recorded each month on an accrual basis for professional medical services and related health care services rendered by the physicians and capitation revenues allocated to professional services revenues. And, it defined "ancillary revenue" as all other revenue actually recorded each month. Simply stated, the MSA provided that the business management fee, after the first five years, was to be 24.7% of CCA's accrued patient revenues and all other accrued revenue.

¶ 10 The relief sought in the arbitration complaint is "a judgment that would reform the terms of the MSA such that AOR Management [AOR–OK] would be compensated at a level that approximates as closely as possible its economic position that it was in prior to changes caused by the MMA [Medicaid Modernization Act]." The arbitration complaint also seeks "costs and expenses, including reasonable attorneys' fees, for prosecution of this proceeding, as well as any further relief to which it justly may be entitled."

¶ 11 CCA did not answer the arbitration complaint. Instead, it filed suit in the Tulsa County District Court on February 14, 2005. The amended petition asserts that the MSA is contrary to established public policy in that it allows AOR–OK to engage in the unlicensed and unauthorized practice of medicine, to split patient revenues, and to exert dominion and control over CCA's medical practice and financial affairs. It further asserts that USON is treating CCA as if it is a wholly–owned subsidiary of USON by exercising dominion and control over CCA's entire business. The amended petition asks the district court to declare that the MSA was void *ab initio* and unenforceable and that there is no valid contract between the parties. It also sought a stay of arbitration and an award of compensatory and punitive damages for breach of contract, fraud and deceit, conversion, and misappropriation and embezzlement, together with interest, costs, and attorney fees against both AOR–OK and USON.

¶ 12 CCA also sought an emergency stay of AOR–OK's arbitration proceeding until the district court decides whether the MSA is contrary to Oklahoma law and public policy and void *ab initio*. The district court stayed the arbitration.

¶ 13 Neither AOR–OK nor USON answered the district court petition. They filed a motion to lift the stay and to compel arbitration. The motion urged arbitration under section 8.6 of the MSA which provides for any controversy, dispute, or disagreement arising out of or relating to the MSA to be submitted to binding arbitration in accordance with Article XI of the Purchase Agreement. Article XI of the Purchase Agreement calls for mediation under the Commercial Mediation Rules of the American Arbitration Association and for binding arbitration under the Commercial Arbitration Rules of the American Arbitration Association.

¶ 14 CCA responded that arbitration proceedings under the Commercial Arbitration Rules of the American Arbitration Association are cost prohibitive. CCA requested an evidentiary hearing on its allegations that 1) there is no valid and enforceable contract between the parties, 2) the costs of arbitration are so excessive as to be unconscionable, and 3) AOR–OK's and USON's management of CCA's business under the MSA is illegal.

¶ 15 The district court received briefs on the enforceability of the arbitration provisions and heard argument of counsel but did not conduct an evidentiary hearing. The district court ruled in favor of AOR–OK and USON on their motion to compel arbitration, dissolved the stay of arbitration, and referred all of CCA's claims to arbitration.

¶ 16 CCA timely appealed the order compelling arbitration and also filed an original action in the event the order compelling arbitration should be declared a non-appealable order. The amended application to assume original jurisdiction asked for relief via a writ of mandamus similar to the relief sought in this appeal.[6] It also asserted that this controversy involves matters of state-wide concern and asked this Court to exercise its original jurisdiction to decide if our state law and public policy may be circumvented by an arbitration clause and the federal arbitration law.

## II. The Appeal

¶ 17 In the pre-decisional stage of this appeal, we determined that the pre-

---

6. In the original action, CCA sought a writ of mandamus directing the district court to stay arbitration, to conduct an evidentiary hearing after reasonable discovery, and to determine whether there exists a valid and enforceable agreement to arbitrate between the parties. We consolidated the original action with the appeal. We treated the original proceeding as seeking a stay pending appeal and stayed the arbitration proceeding during the pendency of this appeal.

judgment order compelling arbitration and staying further proceedings in the district court is a final appealable order, citing 12 O.S.2001, § 953, and *Gilliland v. Chronic Pain Associates, Inc.,* 1995 OK 94, 904 P.2d 73. After *Gilliland,* the United States Supreme Court construed the Federal Arbitration Act (FAA)[7] as prohibiting an appeal from an order compelling arbitration and staying the federal district court proceeding on remaining claims. *Green Tree Financial Corp.-Alabama v. Randolph,* 531 U.S. 79, 86–87, 121 S.Ct. 513, 519–520, 148 L.Ed.2d 373 (2000). We have considered *sua sponte*[8] whether *Gilliland* is consistent with *Green Tree.*[9] Each opinion tested the respective pre-judgment arbitration-related order under the established meaning of "final order." The "final order" analysis under the federal arbitration statutes in *Green Tree*[10] is analo-

gous to the "final order" analysis under Oklahoma's arbitration statutes in *Gilliland.*[11] We stand on our pre-decisional ruling in this case. The order sending "all claims raised by Plaintiff" to arbitration reached the whole controversy and left nothing pending before the district court.[12] Whether analyzed under the FAA or Oklahoma's Uniform Arbitration Act (OUAA),[13] the pre-judgment order compelling all claims to arbitration and staying further district court proceedings in this case is a final appealable order. Upon CCA's motion, we retained the appeal.

## III.  The Issues on Appeal

¶ 18 The district court entered a general order in favor of AOR–OK and USON, sending all of CCA's claims to arbitration. The district court did not conduct the eviden-

7.  9 U.S.C. §§ 1, *et seq.*

8.  This Court has a duty to inquire into the propriety of its jurisdiction. *Fields v. A & B Electronics,* 1990 OK 7, ¶ 4, 788 P.2d 940, 941.

9.  Although the district court order did not determine that the MSA, or any other agreement involved in this litigation, is a contract affecting interstate commerce and governed by the FAA, that issue may be raised on remand. Accordingly, we approach this appeal mindful of the federal arbitration law.

10.  Under the FAA, an appeal may be taken from a final decision with respect to arbitration, 9 U.S.C. § 16(a)(3), but an appeal may not be taken from an interlocutory order compelling arbitration. 9 U.S.C. § 16(b)(2). In deciding whether an order compelling arbitration and dismissing the suit was final, *Green Tree* followed the established meaning of a "final decision." *Green Tree* concluded that the order compelling arbitration and dismissing the suit left no claims pending in federal court and was a final appealable order, while an order compelling arbitration and staying the suit in federal court would be an interlocutory non-appealable order. 531 U.S. at 87–88, 121 S.Ct. at 520–521.

11.  The state arbitration statutes list arbitration-related orders from which an appeal may be taken, 15 O.S.2001, § 817, now codified at 12 O.S.Supp.2005, § 1859, but do not contain language prohibiting an appeal from an order compelling arbitration similar to 9 U.S.C. § 16(b)(2). *Gilliland* determined that the statutory list of appealable arbitration-related orders is not exclusive and that, in the absence of a § 16(b)(2) prohibition against appeal, a pre-judgment order compelling arbitration may be a final appealable

order under the general appeals statutes, 12 O.S. 2001, §§ 952 and 953.

12.  The pre-judgment order compelling arbitration left no claims pending, and it effectively precluded CCA from "proceeding further in the case for the pursuit of the very relief it was seeking." *Gilliland,* at ¶ 8, 904 P.2d at 77. It precluded a declaratory judgment as to the status of CCA and USON under the MSA (CCA alleged that USON is an interloper with no legal authority or contractual right to manage CCA's business) and a declaratory judgment that the MSA is against the public policy of the state of Oklahoma and illegal (CCA alleged the MSA, contrary to Oklahoma law, allows for patient fee splitting and corporate practice of medicine and therefore it is void *ab initio* ). Similar to an end-of-the-line dismissal, the order compelling arbitration is a final appealable order under our general appeals statutes, 12 O.S.2001, §§ 952 and 953.

13.  Oklahoma's uniform arbitration act, 15 O.S. 2001, §§ 801, et seq., is now codified at 12 O.S.Supp.2005, §§ 1851–1881. 2005 Okla.Sess. Laws, ch.364. Effective January 1, 2006, the 2005 legislation expressly applies to all arbitration agreements without regard to the date of the agreement. 12 O.S.Supp.2005, § 1854.

In the district court, AOR–OK and USON urged that Texas law governs this dispute as set out in the MSA. CCA responded that, under Texas law, Oklahoma law would be applied to this case because, among other reasons, it concerns the practice of medicine and the business management of the practice of medicine all within Oklahoma. CCA reargued it position on appeal. On the other hand, AOR–OK and USON effectively abandoned Texas law by their reliance on Oklahoma's arbitration statutes and *Rogers v. Dell Computer Corp.,* 2005 OK 51, 138 P.3d 826.

tiary hearing requested by CCA before compelling arbitration. The district court did not enter any specific findings or conclusions, and its general order compelling arbitration did not otherwise directly address many of the questions raised in the parties' arguments. However, a finding that CCA agreed that this controversy should be resolved by binding arbitration is embraced in the general order in favor of AOR–OK and USON.[14] We must affirm the general order compelling arbitration unless we find that the district court erred in 1) finding the existence of a valid enforceable arbitration agreement between CCA and AOR–OK and USON or 2) sending all of CCA's claims to arbitration without conducting an evidentiary hearing on the existence of a valid and enforceable arbitration agreement and the expense of arbitration under the Commercial Arbitration Rules of the American Arbitration Association before referring all of CCA's claims to arbitration.

## IV. The Standard of Review

¶ 19 The question as to the existence of valid enforceable agreements to arbitrate all of CCA's claims in this case against AOR–OK and USON is a question of law to be reviewed by a *de novo* standard, *Rogers v. Dell Computer Corp.*, 2005 OK 51, ¶ 18, 138 P.3d 826, 831, without deference to the lower court. *Gladstone v. Bartlesville Indep. Sch. Dist. No. 30*, 2003 OK 30, ¶ 5, 66 P.3d 442, 445. The question as to whether the district court, before referring all claims to arbitration, should have conducted an evidentiary hearing relating to the existence of a valid enforceable arbitration agreement and to the expense of arbitration under the Commercial Arbitration Rules of the American Arbitration Association is a procedural question left to the discretion of the district court, *Rogers* at ¶ 17, 138 P.3d at 830–831, and the district court's ruling thereon will not be disturbed on appeal in the absence of clear abuse. *Eskridge v. Ladd*, 1991 OK 3, ¶ 12, 811 P.2d 587, 590.

## V. Federal Arbitration Law

¶ 20 Both sides of this controversy rely on federal court jurisprudence and both argue that the other one's position is inconsistent with federal arbitration law. Whether a contract affects interstate commerce under the FAA often involves questions of fact and law. *See Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 123 S.Ct. 2037, 156 L.Ed.2d 46 (2003). Here, the district court did not find the evidence demonstrates that the business management of CCA involves interstate commerce nor did it conclude that the business management agreement falls within the FAA. Even so, we review the arbitration provisions in light of applicable principles of arbitration law developed under the FAA.

¶ 21 The FAA embodies a liberal policy favoring enforcement of arbitration agreements. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). It requires state and federal courts to honor arbitration agreements duly entered into by the parties and to order the parties to arbitrate their disputes when they have agreed to do so. *Id.*, 460 U.S. at 25, n. 32, 103 S.Ct. at 942. It ensures "judicial enforcement of privately made agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219, 105 S.Ct. 1238, 1241, 84 L.Ed.2d 158 (1985).

¶ 22 Although the FAA favors arbitration when it is the parties' contractual choice of a remedial forum, *id.*, 470 U.S. at 220, 105 S.Ct. at 1242, the courts will not impose arbitration upon parties where they have not agreed to do so. *Id.*, 470 U.S. at 219, 105 at S.Ct. at 1242. The courts will enforce arbitration agreements according to the terms of the parties' contract, as "[a]rbitration is a matter of consent, not coercion." *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). To assure that the parties have consented to arbitration, the courts will decide whether

---

14. A general ruling in favor of a party embraces each finding necessary to sustain the judgment. *Burdick v. Indep. School Dist. No. 52 of Okla. County*, 1985 OK 49, ¶ 12, 702 P.2d 48, 54;

*Lester v. Streich*, 1935 OK 862, 57 P.2d 246, 248. A finding of the existence of a valid enforceable arbitration agreement is necessary to support the order sending all of CCA's claims to arbitration.

there is a valid enforceable arbitration agreement, whether the parties are bound by the arbitration agreement, and whether the parties agreed to submit a particular dispute to arbitration. *See First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). The courts will not require a party to submit a controversy to arbitration where it has not been so agreed. *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83, 123 S.Ct. 588, 591, 154 L.Ed.2d 491 (2002).

## VI. The Parties to the Arbitration Agreement

▮▮ ¶ 23 Under the above federal arbitration law, a court must send a controversy to arbitration when a party brings forth a valid enforceable agreement to arbitrate the controversy. State law is similar. 12 O.S.Supp.2005, § 1858 (A). Here, both AOR–OK and USON moved for arbitration under the MSA. CCA alleged that AOR–OK and USON are two separate and distinct Delaware corporations, one with its offices in Tulsa, Oklahoma, the other with its offices in Houston, Texas, and one registered to do business in Oklahoma and the other not so registered. Neither AOR–OK nor USON dispute these allegations. AOR–OK and USON argued that USON could arbitrate the dispute with CCA because of its operating subsidiary, AOR–OK,[15] while CCA argued that USON is an interloper with no legal authority or contractual right to manage CCA's business.[16]

▮▮ ¶ 24 Having perused the MSA, it appears, beyond argument, to be a contract between CCA and AOR–OK by assignment. USON has not alleged that it is a party to the MSA, and there is no evidence in the appellate record tending to prove that fact. Further, USON does not dispute that it is a separate corporate entity distinct from AOR–OK. But, AOR–OK and USON, at least implicitly, argue that they act as one legal entity.[17] This argument suggests that the courts ignore their separate and distinct corporate identities which we will not do on this record.[18]

▮ ¶ 25 The issue as to the existence of an arbitration agreement presents a gateway question about whether the parties are

15. AOR–OK and USON argued in the district court, at least by implication, that they should be treated as one. In their appellate answer brief, AOR–OK and USON take a similar position. They assert that AOR–OK is a wholly-owned subsidiary of USON and that USON is "a nationwide health management company" that "manages the business aspects of over 850 physicians in numerous groups located in 28 states" by virtue of "agreement between U.S. Oncology's direct and indirect subsidiaries and numerous physician groups."

16. In its appellate brief in chief, CCA again asserts that even though "AOR–OK is the contractually designated 'business manager,' USON without legal or contractual authority is the de facto 'business manager' of CCA, controlling its personnel, practice, revenues, operations, business and administrative affairs although a non-domesticated and medically unlicensed foreign corporation."

17. Generally, a corporation is a distinct legal entity separate and apart from other legal entities unless separate corporate existence is a scheme to perpetrate a fraud or one corporation is organized and controlled by the other corporation as a mere instrumentality or adjunct so that it is a dummy or sham corporation. *Tulsa Tribune Co. v. State ex rel. Okla. Tax Comm.,* 1989 OK 13, ¶¶ 20–21, 768 P.2d 891, 893; *Gulf Oil Corp. v. State,* 1961 OK 71, ¶ 10, 360 P.2d 933, 936.

18. Under the principles of agency law or the doctrine of piercing the corporate veil, the law may disregard corporate distinctions and treat two separate legal entities as one. *Frazier v. Bryan Mem'l Hosp. Auth.,* 1989 OK 73, ¶, 775 P.2d 281, 288. The nature of the relationship is critical to pierce the corporate veil. *Frazier* involved the Hospital Corporation of America and its wholly-owned subsidiary HCA Management Company, Inc. Although the subsidiary had the management agreement with the hospital authority to operate the hospital, Frazier sued the hospital and the parent corporation but not the subsidiary, alleging negligence in the creation and implementation of employment and administrative policies in the operation of the hospital under the management agreement. The parent corporation moved for and was granted summary judgment because it was not a party to the management agreement. In *Frazier,* this Court found material facts regarding the nature of the relationship between the parent company and its subsidiary to be in dispute and reversed the summary judgment. Although CCA alleged that USON has assumed AOR–OK's role under the MSA, there is no evidence in this appellate record showing the nature of the relationship between AOR–OK and USON.

bound by a given arbitration clause and raises a "question of arbitrability" for a court to decide. See 12 O.S.Supp.2005, § 1857; *Howsam*, 537 U.S. at 84, 123 S.Ct. at 592. There is nothing in this appellate record indicating USON is a party to the MSA, and it goes without saying that a stranger to a contract neither enjoys the contract benefits nor carries the contract obligations. However, USON will have an opportunity to produce any evidence it may have proving it is bound by the MSA in further proceedings in the district court on remand.

### VII. The Arbitration Agreement

■ ¶ 26 AOR–OK and USON contend that CCA's agreement to arbitrate the instant controversy is set out in two provisions in the MSA and one provision in the Purchase Agreement. Those provisions are 1) section 7.2(d), which requires binding arbitration to change the terms of the contract, 2) section 8.6, which requires binding arbitration to settle controversies, disputes and disagreements arising out of the MSA, and 3) section 11.01 of the Purchase Agreement, which requires mediation and binding arbitration to settle controversies, disputes and disagreements arising out of the Purchase Agreement. The provisions of arbitration agreements will be examined under general principles of state contract law. *Kaplan*, 514 U.S. at 944, 115 S.Ct. at 1924.

■ ¶ 27 The following elementary rules of contract law are applicable here. The courts will read the provisions of a contract in their entirety, *Mortgage Clearing Corp. v. Baughman Lumber Co.*, 1967 OK 232, ¶ 11, 435 P.2d 135, 138, to give effect to the intention of the parties as ascertained from the four corners of the contract, and where the language is ambiguous, it will be interpreted in a fair and reasonable sense. *Id.*, at ¶ 13, 435 P.2d at 139; 15 O.S.2001, §§ 155 and 157.[19] The courts will read the contract language in its plain and ordinary meaning unless a technical meaning is conveyed. *Pitco Production Co. v. Chaparral Energy, Inc.*, 2003 OK 5, ¶ 14, 63 P.3d 541, 545–546. The courts will decide, as a matter of law, whether a contract provision is ambiguous and interpret the contract provision as a matter of law, *id.*, at ¶ 12, 63 P.3d at 545, where the ambiguity can be cleared by reference to other provisions or where the ambiguity arises from the contract language and not from extrinsic facts. *Paclawski v. Bristol Laboratories, Inc.*, 1967 OK 21, ¶ 24, 425 P.2d 452, 456.

■ ¶ 28 Guided by these rules, we review the arbitration provisions. Section 7.2(d) of the MSA requires the parties to agree to a **new service arrangement or a new basis for compensation for the services** and thereby amend those provisions in the MSA whenever specific **external forces** affect the manner in the which the management service will be performed or compensated. If the parties cannot agree on the changes in the contract, the plain meaning of the words in section 7.2(d) is that an arbitrator will arbitrarily rewrite those provisions in the contract.[20] This section does not deal

---

19. 15 O.S.2001, § 155 provides: "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible, subject, however, to the other provisions of this article." 15 O.S.2001, § 157 provides: "the whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others."

20. Subsection (d) of Section 7.2 *Termination* provides:

(d) *Legislative, Regulatory or Administrative Change*. In the event there shall be a change in the Medicare or Medicaid statutes, State statutes, case laws, regulations or general instructions, the interpretation of any of the foregoing, the adoption of new federal or State legislation, or a change in any third party reimbursement system, any of which are reasonably likely to materially and adversely affect the manner in which either party may perform or be compensated for its services under this Management Services Agreement or which shall make this Management Services Agreement unlawful, **the parties shall immediately enter into good faith negotiations regarding a new service arrangement or basis for compensation for the services furnished pursuant to this Management Services Agreement that complies with the law, regulation, or policy and that approximates as closely as possible the economic position of the parties prior to the change.** If good faith negotiations cannot resolve the matter, **it shall be submitted to arbitration as referenced in Section 8.6.**
(Bold added.)

with controversies arising out of the contract to which the parties have agreed. It does not deal with disputes as to the meaning of the contract terms nor does it deal with the application or performance of the contract to which the parties have agreed. This arbitration provision does not concern "a controversy arising out of such contract or transaction" under the FAA or the OUAA.[21] It concerns the parties' failure to mutually agree to amend the MSA to provide new terms for the management services or management compensation.

¶ 29 Some two years ago when the relationship with CCA, AOR–OK and USON was unworkable, CCA gave notice to AOR–OK that the MSA was void. In response, AOR–OK filed an arbitration complaint under section 7.2(d) asking that an arbitrator alter the terms of the MSA because the economy and Medicare/Medicaid reimbursement have changed. Although the arbitration complaint requested that the MSA be reformed, AOR–OK did not seek the contract remedy of reformation.[22] AOR–OK

sought a rewriting of the compensation provisions in the MSA.

¶ 30 The FAA reversed the long-standing judicial hostility to arbitration agreements and placed them upon the same footing as other contract provisions. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404–405, n. 12–13, 87 S.Ct. 1801, 1806–1807, 18 L.Ed.2d 1270 (1967); *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 225–226, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987). Both the FAA and the OUAA require the courts to honor private parties' agreements to settle their "controversies" in the arbitral forum. The FAA and the OUAA recognize arbitration is the remedial forum agreed to by the parties as a substitute for suit in the courts. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26, 111 S.Ct. 1647, 1652, 114 L.Ed.2d 26 (1991). The courts will not rewrite a contract for the benefit of one party, *Dismuke v. Cseh*, 1992 OK 50, ¶ 9, 830 P.2d 188, 190, and neither will the courts compel one party to submit to a substitute forum to rewrite the contract terms for the benefit of another party.[23] Arbitration is not a forum to re-

---

**21.** The FAA, 9 U.S.C. § 2, governs agreements to settle by arbitration "a controversy thereafter arising out of such contract." The OUAA, 12 O.S.Supp.2005, § 1857 (a), governs agreements "to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement."

**22.** Reformation is a contract remedy available to conform a written contract to the parties' antecedent agreement when that written contract differs from the antecedent expressions on which the parties based their agreement. See 15 O.S. 2001, § 156. Reformation requires proof of the contract to be reformed and proof, by clear and convincing evidence, of a mutual mistake or mistake by one party and inequitable conduct on the part of the other that resulted in a written contract that did not reflect the parties' intent. *Thompson v. Estate of H.H. Coffield*, 1995 OK 16, ¶ 10, 894 P.2d 1065, 1067. Reformation corrects a mistake between the written document and the actual intent of the contracting parties, but reformation does not rewrite a contract because it has become less favorable to one party due to subsequent economic changes.

**23.** By this we do not mean that we would not compel interest arbitration under our collective bargaining statutes, such as 11 O.S.2001, § 51–101 et seq. Labor law recognizes two kinds of arbitration, grievance arbitration and interest arbitration. *Mulvaney Mechanical, Inc. v. Sheet*

*Metal Workers Int'l Assoc., Local 38*, 288 F.3d 491, 494 (2nd Cir.2002). Grievance arbitration involves interpreting an existing employment contract to determine whether its conditions have been breached. *Id.* Interest arbitration involves referring a dispute created by the failure of the parties to negotiate a new contract to an arbitration panel in order to establish terms and conditions of a future employment contract. *Id.;* see *Montgomery Mailers' Union No. 127 v. Advertiser Co.*, 827 F.2d 709, 716, n. 7 (11th Cir.1987) (noting that in interest arbitration, the arbitrator writes the terms of a new contract when the employer and the employees have reached an impasse in the collective bargaining process). Interest arbitration clauses are enforceable only with respect to mandatory subjects of collective bargaining. *Mulvaney Mechanical, Inc.*, 288 F.3d at 505. "An interest arbitration clause is void as contrary to public policy to the extent that it applies to nonmandatory subjects of bargaining, *i.e.*, subjects other than wages, hours and other terms and conditions of employment; this includes the insertion of a successor interest arbitration clause in a new agreement." *Id.* Because interest arbitration deprives the parties of their right to exclude nonmandatory subjects from the collective bargaining agreement, interest arbitration is contrary to the national labor policy. *Nat'l Labor Relations Bd. v. Sheet Metal Workers Int'l Assoc., Local No. 38*, 575 F.2d 394, 399 (2nd Cir.1978). In sum, interest arbitration

write a contract that has become less favorable to one party under the economy of the day.[24] We conclude, as a matter of law, that the failure of the parties to reach an agreement to amend their contract does not constitute "a controversy arising out the contract or transaction" under the FAA or the OUAA, and the arbitration provision in section 7.2(d) of the MSA, which comes into play when the parties cannot agree to amend the MSA, is not an arbitration agreement enforceable under the FAA or the OUAA.

¶ 31 We turn now to section 8.6 of the MSA which requires binding arbitration of controversies, disputes and disagreements arising out of the MSA.[25] As we have already recognized, CCA and AOR–OK by assignment are parties to the MSA. Section 8.6, on its face, expresses the parties' agreement to submit controversies arising out of the MSA or the breach of the MSA to binding arbitration. However, all of CCA's claims may not arise out of the MSA or a breach of the MSA.

¶ 32 CCA's claims against USON relate directly to USON's conduct, its alleged wrongful non-contractual handling of CCA's financial affairs, and relate only indirectly to the MSA.[26] CCA's claim against AOR–OK for alleged complicity in USON's alleged wrongdoing also relates directly to USON's conduct, while CCA's claim for declaratory judgment that the MSA is contrary to public policy and CCA's claim of fraud in the in-

ducement obviously relate directly to the MSA.

¶ 33 Even though the plain meaning of the terms of section 8.6 provides for arbitration of disputes relating to the MSA or a breach of the MSA, AOR–OK may not be entitled to bring all of CCA's claims under section 8.6. This is so because section 8.8 contemplates that either party may file a legal action to enforce or interpret the MSA.[27] In this case, CCA seeks judicial interpretation of the MSA. Like any other contract provision, an arbitration provision will be read together with other provisions of the contract so as to give effect to the intention of the parties ascertained from the four corners of the contract. By including both these remedial provisions, it is clear that the parties did not intend that arbitration would be the exclusive remedy. The arbitration provision in section 8.6 does not preclude CCA from seeking declaratory judgment to interpret the MSA and determine the status of the parties thereunder and its conformity to the public policy of the state of Oklahoma as contemplated in section 8.8.

¶ 34 AOR–OK and USON contend that it is the broad language in the arbitration provision of the Purchase Agreement that clearly provides for all claims related to the MSA to be resolved in binding arbitration. It is true that section 11.01 of the Purchase Agreement expresses a sweeping arbitration scope to include contract and

---

is contrary to the freedom of contract and generally disfavored.

24. Our independent research did not reveal any decision dealing with a contract clause that uses binding arbitration to rewrite the contract obligations similar to section 7.2(d). Section 7.2(d) is not akin to an interest arbitration provision nor is it similar to a "favored nations" clause in a gas purchase contract calling for price redetermination based on a higher price paid in the area. *See Texas Gas Transmission Corp. v. Shell Oil Co.*, 363 U.S. 263, 80 S.Ct. 1122, 4 L.Ed.2d 1208 (1960).

25. Section 8.6 *Arbitration* of the MSA provides:

The parties shall use good faith negotiation to resolve any **controversy, dispute or disagreement** arising out of or relating to this Management Services Agreement or the breach of this Management Services Agreement. Any matter

not resolved by negotiation shall be submitted to binding arbitration and such arbitration shall be governed by the terms of Article XI of the Purchase Agreement, which, as it applies to the parties hereto, is incorporated herein by reference in its entirety.
   (Bold added.)

26. USON argues that it manages the business aspects of physician groups through its "direct and indirect subsidiaries."

27. Section 8.8 *Enforcement* provides:

**In the event either party resorts to legal action to enforce or interpret any provision of this Management Services Agreement,** the prevailing party shall be entitled to recover the costs and expenses of such action so incurred, including, without limitation, reasonable attorneys' fees.
   (Bold added.)

tort controversies arising under the Purchase Agreement.[28] Even if section 11.01 is incorporated into the MSA by reference in section 8.6, its arbitration scope still relates to controversies under the Purchase Agreement. The appellate record does not indicate that any of CCA's claims relate in any way to the Purchase Agreement. Further, the Purchase Agreement provides for cumulative remedies,[29] so that neither the Purchase Agreement nor the MSA gives rise to a presumption that the parties agreed that an arbitrator would have exclusive authority to interpret the contract. Generally, the courts will decide questions of arbitrability unless there is clear and unmistakable evidence that the parties agreed to arbitrate arbitrability. *Kaplan,* 514 U.S. at 944–945, 115 S.Ct. at 1924–1925. We leave to the district court in the first instance to decide whether any of CCA's claims against AOR–OK are within the arbitration provisions in section 8.6.

¶ 35 Finally, CCA opposed the motion to compel arbitration because participation in the arbitral forum under the Commercial Arbitration Rules of the American Arbitration Association is conditioned upon the payment of exorbitant arbitration fees and costs. In response, AOR–OK and USON urged that the medical physicians have sufficient funds to pay the fees and that an arbitrator might reallocate the fees among the parties at the conclusion of the arbitration proceeding. This response did not dispel the allegation of exorbitant arbitration fees and costs to be paid by CCA nor did it vitiate the need for an evidentiary hearing as to whether the costs render the arbitration provision unenforceable. *See Green Tree Financial Corp.-Alabama,* 531 U.S. at 91, n. 6, 121 S.Ct. at 522 (noting that assertions that arbitration costs are too high must be supported by proof of the costs, such as filing fees, administrative fees, and arbitrator's fees, that will in fact be imposed for the arbitration); *Bradford v. Rockwell Semiconductor Systems, Inc.,* 238 F.3d 549, 556 (4th Cir.2001) (concluding that there should be a case-by-case analysis of whether the costs of arbitration renders an arbitration agreement unenforceable).

## VIII. Evidentiary Hearing on Motion to Compel Arbitration

■■■■■ ¶ 36 We turn now to the procedural issue of whether the district court should have conducted an evidentiary hearing before it referred all claims to arbitration. This issue is controlled by Rule 4(c) of the Rules for District Courts. 12 O.S.Supp. 2002, ch. 2, app. Rule 4(c) requires either a hearing or a stipulation on fact issues raised on a pre-trial motion.[30] Here, CCA filed briefs with citations of authorities and affida-

---

**28.** Section 11.01 *Mediation and Arbitration* of the Purchase Agreement provides:

> **Any dispute, controversy or claim** (including without limitation tort claims, requests for provisional remedies or other interim relief, and issues as to arbitrability of any matter) **arising out of this Purchase Agreement,** or the breach thereof, that cannot be settled through negotiation shall be settled (a) first, by the parties trying in good faith to settle the dispute by mediation under the Commercial Mediation Rules of the American Arbitration Association ("AAA") (such mediation session to be held in Tulsa, Oklahoma, and to commence within 15 days of the appointment of the mediator by the AAA), and (b) if the controversy, claim or dispute cannot be settled by mediation, then by arbitration administered by the AAA under its Commercial Arbitration Rules (such arbitration to be held in Tulsa, Oklahoma before a single arbitrator and to commence within 15 days of the appointment of the arbitrator by the AAA), and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

(Bold added.)

**29.** Section 12.02 *Remedies No Exclusive* provides:

> No remedy conferred by any of the specific provisions of this **Purchase Agreement or any other Transaction Document** is intended to be exclusive of any other remedy, and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise. The election of any one or more remedies by any party hereto shall not constitute a waiver of the right to pursue other available remedies.
> (Bold added.)

**30.** Rule 4(c) of the Rules for the District Courts reads:

> Motions raising fact issues shall be verified by a person having knowledge of the facts, if possible; otherwise, a verified statement by counsel of what the proof will show will suffice **until a hearing or stipulation can be provided.**

vits and other documents in opposition to the motion to compel arbitration. CCA's filings opposing arbitration raised fact issues as to whether the arbitration fees and expenses are so excessive as to render arbitration unconscionable. CCA requested that the district court conduct an evidentiary hearing before ruling on the motion to compel arbitration. The district court did not conduct an evidentiary hearing. Without a stipulation settling the fact issues raised by CCA, the district court was duty-bound under Rule 4(c) to grant CCA's requested evidentiary hearing and allow CCA to present proof in support of its opposition to the motion to compel arbitration. Such a hearing comports with notions of procedural due process.[31] Accordingly, we find the district court clearly abused its discretion in failing to follow Rule 4(c).

¶ 37 The order compelling arbitration on all of CCA's claims must be reversed and remanded. On remand, the district court must conduct an evidentiary hearing on the existence of a valid and enforceable arbitration agreement and the expense of arbitration under the Commercial Arbitration Rules of the American Arbitration Association before deciding which, if any, of CCA's claims are subject to an enforceable arbitration agreement. Should the district court determine that USON has no arbitration agreement with CCA, it must proceed to hear the merits of all of CCA's claims against USON.[32]

## IX. The Original Action

■ ¶ 38 We consolidated CCA's original action, No. 102,612, with the retained appeal. The relief CCA sought via this Court's writ of mandamus has been granted in this appeal, and for that reason, we would not issue the writ. However, CCA's original action also urged us to exercise our original jurisdiction as a court of first instance to address the issue of whether the state public policy may be circumvented by an arbitration clause.

¶ 39 Our state constitution, Okla. Const., art. 7, § 4, vests this Court with the discretion to exercise original jurisdiction as a court of first instance, concurrent with the jurisdiction of the district courts, as well as the authority to issue writs to the courts below. Although we may exercise original jurisdiction to entertain a case in the first instance as distinguished from our appellate jurisdiction, *Burks v. Walker*, 1909 OK 317, 25 Okla. 353, 109 P. 544, *Syllabus by the Court*, No. 3, historically, we have exercised our original jurisdiction to entertain private disputes when a great public concern is involved or if a great injury will be suffered by our failure to exercise original jurisdiction. *Jarman v. Mason*, 1924 OK 722, ¶ 20, 229 P. 459, 463, 102 Okl. 278. Otherwise, we leave the case to the jurisdiction of the district court in the first instance. *Kitchens v. McGowen*, 1972 OK 140, ¶ 6, 503 P.2d 218, 219.

¶ 40 We recognize the egregious nature of illegal patient-fee splitting and unlicensed practice of medicine, fraud and fraud in the inducement, and misappropriation and embezzlement as claimed by CCA. We also recognize that CCA's physicians are engaged in oncology medical practices throughout the state. However, this suit involves private litigants, private contracts, and alleged tortious conduct of private entities. We do not view this case as involving the interests of the sovereign state over which we would assume original jurisdiction to sit as a court of first instance or otherwise requiring this tribunal of last resort to function as the trial

(Bold added.)

**31.** Procedural due process requires a meaningful opportunity to be heard. Okla. Const., art. 2, §§ 6 and 7; *Flandermeyer v. Bonner*, 2006 OK 87, 152 P.3d 195.

**32.** The district court must hear CCA's claims against USON that are not covered by an arbitration agreement even if CCA's claims against AOR–OK are properly referred to arbitration. *See Moses H. Cone Mem'l Hosp.*, 460 U.S. at 20–

21, 103 S.Ct. at 939 (wherein the construction company's claims were referred to arbitration and the hospital was left to defend against the architect in state court); *Volt Info. Sciences, Inc.*, 489 U.S. at 476, n. 5, 109 S.Ct. at 1254 (noting that the FAA is not designed to deal with problems that arise in multiparty contractual disputes where some but not all parties have arbitration agreements); *see also* 12 O.S.Supp.2005, § 1858 (G) (providing that arbitration controversies may be severed from other claims).

court. Accordingly, we do not assume original jurisdiction in No. 102, 612.

## X. Conclusion

¶ 41 We conclude that the district court erred in refusing to conduct an evidentiary hearing as requested by CCA on the fact issues raised in the filings on the motion to compel arbitration. We also conclude, as a matter of law, that the arbitration provision in section 7.2(d) of the MSA is not enforceable under the FAA or the OUAA. We reverse the order dissolving the temporary stay of arbitration and compelling all claims to arbitration and remand this cause to the district court. On remand, the district court shall proceed to conduct an evidentiary hearing and, in ruling on the motion to compel arbitration, make findings of fact and conclusions of law on all issues raised by the parties. We note appellees' lately filed motion to dismiss or request for instructions. The motion to dismiss is denied. The request for instructions may be presented to the district court on remand.

**ORDER COMPELLING ARBITRATION REVERSED AND CAUSE REMANDED WITH INSTRUCTIONS; ORIGINAL JURISDICTION DENIED.**

WINCHESTER, C.J., EDMONDSON, V.C.J., and LAVENDER, HARGRAVE, OPALA, TAYLOR, and COLBERT, JJ., concur.

KAUGER, J., concurs in result.

WATT, J., concurs in part and dissents in part.