2012 OK CIV APP 83

**In the Matter of Randolph S. FRANCIS, Petitioner/Appellant,**

v.

**Marsha Storm FRANCIS, Respondent/Appellee.**

**No. 109,070.**

Court of Civil Appeals of Oklahoma, Division No. 4.

Aug. 21, 2012.

Clyde A. Muchmore, Elizabeth J. Barnett, Crowe & Dunlevy, P.C., Oklahoma City, Oklahoma, and Debbra J. Gottschalk, Tulsa, Oklahoma, for Petitioner/Appellant.

Russell D. Carson, Tulsa, Oklahoma, for Respondent/Appellee.

KEITH RAPP, Judge:

¶1 The trial court petitioner, Randolph Francis (Husband), appeals a part of a decree of divorce entered in a dissolution of marriage action with the respondent, Marsha Storm Francis (Wife). After review, this Court affirms the appealed decree in part and reverses in part.

## BACKGROUND

¶2 This appeal concerns the trial court's interpretation of the parties' antenuptial agreement ("Agreement") favorably to Wife and the award to Wife under the Agreement. The parties stipulated that the Agreement is valid.[1]

¶3 The parties met in about 1998, and had a relationship. Wife worked as Husband's assistant in marketing and managing an apartment complex under construction and then post-construction. They married in March of 2003.

¶4 After the marriage, the parties had periods of marital strife and separation. After the first separation, Wife obtained a psychiatrist's evaluation and treatment. Husband knew before the marriage about Wife's long history of mental and emotional disorders.

¶5 After the marriage, Wife's condition did not improve. On December 29, 2003, Wife applied for Social Security disability benefits. Husband testified that he was unaware that she had done so until afterward.

¶6 The Social Security Administrative Law Judge (ALJ) issued a Decision in which he reviewed Wife's work history, medical history and medical reports. The ALJ made a finding that Wife was under disability, as defined by Social Security law and regulations, since the date of onset of March 31, 2000, and continuing through the date of the decision, November 18, 2005.[2] Wife was

---

1. The Agreement is in the District Court Record beginning on page 244.

2. Record, pp. 255–64. At trial, Husband called Wife's Social Security attorney. He testified gen-

awarded benefits, including Medicare insurance. With the exception of Part B of Medicare insurance, Wife was receiving these benefits at the time of trial.[3] The ALJ's determination required that Wife's condition be reviewed every three years and that she report if she goes to work or her condition improves. The ALJ's determination was admitted into evidence in the trial of this cause and referenced by the trial court in its decision.[4]

¶ 7 On March 13, 2003, prior to the marriage, the parties entered into the Agreement. The Agreement provides for the parties to retain, as their separate property, everything they then owned and any enhancements and changes to that property. In addition, the Agreement contains recitals of full disclosure and that both are competent to contract.

¶ 8 The trial court found that Husband, an attorney, was the drafter of the text of the Agreement. At his request, Wife obtained copies of other agreements from another attorney. Husband then marked those agreements and had Wife type the final text, which he reviewed for himself. Husband hired an attorney to represent Wife and she consulted with that attorney, but no changes were made. The trial court ruled that the Agreement would be construed against Husband as the drafter of the Agreement.

¶ 9 The first dispute in this appeal involves interpretation of the Agreement, and in particular, Paragraph 12. Paragraph 11 of the Agreement is also implicated in the case. Paragraphs 11 and 12 provide:

11. SUPPORT. Each has been self-supporting for a period of time prior to the contemplated marriage. Both parties feel that they are capable of future self-support and of maintaining themselves on a self-supporting basis. Therefore, in the event of a marital separation of (sic) dissolution of marriage, it is agreed and understood that neither party shall seek or obtain any form of alimony or support from the other or seek any relief other than a distribution of those property interests acquired during the course of their marriage, in any manner other than as provided by this Agreement.

12. DISABILITY. Upon the disability of either party, the other shall assume complete responsibility to the extent of all their earnings and assets for the care of the disabled party.

¶ 10 The Agreement's provisions relating to property and income provide for the then existing property and income and for future property and income. The Agreement also provides:

RECITALS. This agreement is made on the basis of the following facts:

. . . .

3. The parties desire to define their rights and responsibilities regarding property and financial matters to the extent these can be foreseen.

¶ 11 Husband's position is that Paragraph 12 of the Agreement must be construed to mean a future disability rather than one existing at the time the parties entered into the Agreement. The ALJ Decision fixed the date of disability onset. Husband argues that the subsequent ALJ determination of disability based upon a condition existing on and prior to the date of the Agreement, did not fall within the provision of Paragraph 12.[5] Thus, Husband would have Paragraph 12 of the Agreement interpreted to mean that Wife's condition, which was known to both parties, did not constitute a disability within the meaning of Paragraph 12.

erally about the process leading to a disability decision. According to his experience, the date of onset of disability would be the last date on which wages subject to Social Security tax were paid, but only if the medical evidence also supported that determination. Transcript, August 27, 2010, pp. 50, and following.

3. Wife testified that Husband returned checks to Social Security after the parties separated and that Medicare premiums were not paid so it was cancelled as to Part B for doctors. She has not pursued any claim regarding the Part B insurance here.

4. Husband's objection to consideration was overruled after argument. Transcript, June 16, 2010, pp. 74–77.

5. *See* n. 2.

¶ 12 Wife testified about her history with Husband. Wife stated that her emotional and psychological health began to change after the marriage. She saw a physician who diagnosed bipolar disorder and prescribed medication. She acknowledged prior treatment for ADHD and indication from the treating physician that she may have bipolar disorder.

¶ 13 According to Wife, the medicine helped initially. However, her condition did not improve and she was unable to continue work in Husband's apartment complex. This led to filing for Social Security disability benefits and the eventual ALJ Decision. Wife testified that she is presently unable to work because of the same conditions that prevented her from working in the past.

¶ 14 In addition to her testimony and the ALJ Decision, Wife presented Lon Huff, an expert in vocational rehabilitation determinations. He expressed the opinion that Wife was unable to work on a sustained or part-time basis and unable to be retrained. He based his opinion on the references to medical reports in the ALJ decision, an interview with Wife, her medication history, and his experience. In response to a question from the trial court, he advised that he was not making a disability determination and that such determination is distinct from a vocational rehabilitation determination.[6]

¶ 15 The trial court rejected Husband's position.[7] The trial court ruled that the phrase "Upon the disability" meant the determination of disability "even if the disability began before the marriage or the execution of the prenuptial agreement."[8] The trial court ruled that Wife became disabled during the marriage. Referencing the ALJ disability determination, the trial court found that Wife is a disabled person.[9]

¶ 16 The trial court considered Wife's testimony that her living expenses were approxi-

mately $6,300.00 per month.[10] The trial court reduced this sum to $4,825.00 per month as necessary and reasonable living expenses. The sum was further reduced by Wife's Social Security benefits, but child support from another person was not taken into account. The trial court awarded Wife $4,225.00 per month and found that Husband had the ability to pay this amount. The trial court did not make the award terminable on subsequent events or by date, because the ruling expressly disclaimed that the award was support alimony. No provision was made for modification on any basis.

¶ 17 Husband appeals.[11]

## STANDARD OF REVIEW

█ ¶ 18 Interpretation of the parties' Agreement forms the premise for resolution of the dispute. "Unless affected by fraud, duress, coercion, overreaching, or the like, an antenuptial agreement will be enforced according to its terms." *In re Marriage of Neundorf*, 2006 OK CIV APP 10, ¶ 11, 131 P.3d 142, 144.

█ ¶ 19 The language of the Agreement, when unambiguous, governs its meaning. 15 O.S.2001, §§ 137, 154; *Ollie v. Rainbolt*, 1983 OK 79, ¶ 12, 669 P.2d 275, 279.

Where a contract is complete in itself and, as viewed in its entirety, is unambiguous, its language is the only legitimate evidence of what the parties intended. The intention of the parties cannot be determined from the surrounding circumstances, but must be gathered solely from the words used.

*Ollie*, 1983 OK 79 at ¶ 12, 669 P.2d at 279.

█ ¶ 20 Interpretation of the Agreement must, therefore, be based upon the language of the Agreement without resort to

6. Transcript, June 16, 2010, pp. 133–34.

7. Transcript of Decision, pp. 9–10. Record, p. 368.

8. Journal Entry, pp. 3–4.

9. Transcript of Decision, pp. 7–8. Record, p. 368.

10. Transcript, June 16, 2010, pp. 189, and following.

11. Appellee filed, in accord with the order of this Court filed July 5, 2012, the disposition of Appellant's Motion for Reconsideration of January 4, 2011, showing it was denied by the trial court on March 21, 2011.

rules of construction used as an aid whenever ambiguity is found to exist.

The parol evidence rule provides that unless fraud or mistake is involved pre-contract negotiations and oral discussions are merged into, and superseded by, the terms of the executed written agreement. While parol testimony cannot vary, modify or contradict the terms of the instrument, it is admissible to explain the meaning of words when there is a latent ambiguity in the written text of the agreement. Thus the practical construction of an agreement, as evidenced by the acts and conduct of the parties, is available only in the event of an ambiguity. But where a contract is complete in itself and, as viewed in its entirety, is unambiguous, its language is the only legitimate evidence of what the parties intended. The intention of the parties cannot be determined from the surrounding circumstances, but must be gathered from a four-corners' examination of the contractual instrument in question.

*Mercury Inv. Co. v. F.W. Woolworth Co.,* 1985 OK 38, ¶ 9, 706 P.2d 523, 529.

¶ 21 The appellate court has the plenary, independent, and nondeferential authority to reexamine a trial court's legal rulings. *Neil Acquisition, L.L.C. v. Wingrod Investment Corp.,* 1996 OK 125, 932 P.2d 1100 n. 1.

¶ 22 An action for dissolution of a marriage, along with its attendant dispositions, is one of equitable cognizance, and the trial court's judgment will not be disturbed on appeal unless found to be clearly against the weight of evidence or contrary to law. *Carpenter v. Carpenter,* 1983 OK 2, ¶ 24, 657 P.2d 646, 651. The burden of showing that the judgment is against the clear weight of evidence is on the appellant. *Manhart v. Manhart,* 1986 OK 12, 725 P.2d 1234; *Sien v. Sien,* 1994 OK CIV APP 159, 889 P.2d 1268.

**ANALYSIS AND REVIEW**

¶ 23 The parties' present the Agreement as a valid, enforceable contract. Neither asserts that the Agreement suffers any ambiguity, yet each offers an alternative interpretation of the meaning of Paragraph 12 of the Agreement. The statutes provide the directions for interpretation of the Agreement. 15 O.S.2011, §§ 154, 155.[12] "The courts will read the provisions of a contract in their entirety to give effect to the intention of the parties as ascertained from the four corners of the contract, and where the language is ambiguous, it will be interpreted in a fair and reasonable sense." *Oklahoma Oncology & Hematology, P.C. v. U.S. Oncology, Inc.,* 2007 OK 12, ¶ 27, 160 P.3d 936, 946. "The intention of the parties must be deduced from the entire agreement, and every provision must be construed so as to be consistent with each other and that construction adopted which, if possible, gives effect to every part of the contract." *Sullivan v. Gray,* 1938 OK 183, ¶ 7, 78 P.2d 688, 690.

¶ 24 In the construction of contracts, it is the duty of the court to place itself, as far as possible, in the situation of the parties at the time their minds met upon the terms of the agreement, and from a consideration of the writing itself, ascertain their intention. 15 O.S.2011, § 152.[13] Thus, a contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting. The rule applies to prenuptial agreements. *Neundorf v. Neundorf,* 2006 OK CIV APP 10, ¶ 11, 131 P.3d 142, 144.

¶ 25 This Court notes the recital in the Agreement that the parties are defining their rights and responsibilities "to the extent these can be foreseen." Generally,

---

12. Section 154 provides:
    The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.
    Section 155 provides:
    When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible, subject, however, to the other provisions of this article.

13. Section 152 provides:
    A contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful.

recitals in a contract will not control the operative clauses of the contract unless the latter are ambiguous; but they may be looked to in determining the proper construction of the contract and the parties' intention. *Thomas v. Dancer*, 1953 OK 365, ¶ 20, 264 P.2d 714, 718.

Since recitals indicate only the background of a contract, that is, the purposes and motives of the parties, they do not ordinarily form any part of the real agreement. Generally, they do not have the force of contractual stipulations. However, recitals may have a material influence in construing the contract and determining the intent of the parties, and in such respect they should, so far as possible, be reconciled with the operative clauses and be given effect.

17A Am., Jur.2d Contracts, § 392 (1991).

¶ 26 The operative clause is Paragraph 12 of the Agreement. The text of the Agreement does not mention the state of health or any disability of either party other than to recite that each are competent to contract. The obligation under Paragraph 12 of the Agreement is triggered "[u]pon the disability of either party." The Agreement does *not* provide: (1) any definition of "disability" including the degree or severity of the disability, (2) any criteria for determination of "disability," or (3) any time period for when the "disability" may be found to exist.

¶ 27 The term "disability" is taken in its ordinary meaning. 15 O.S.2011, § 160. The term is defined as "inability to pursue an occupation or perform services for wages because of physical or mental impairment." Webster's Third International Dictionary, p. 642 (1986). The parties did not make provision in the Agreement relating to the nature,

timing and severity of the disability. The trial court's finding of disability, as here defined, is supported by the totality of the evidence, not just the ALJ Decision.[14] Husband has not demonstrated otherwise in this appeal.

¶ 28 The facts of this case clearly show that when the Agreement was signed, Wife had the conditions ultimately leading to the determination of her disability by the trial court. Moreover, Husband was aware of her condition and her then limited ability to work. It is not unreasonable to conclude that it was foreseeable that Wife's condition at the time of the Agreement was made could result in a disability. Therefore, the date on which the Wife's condition matured into the disability is not material.[15]

¶ 29 Thus, the trial court's determination that Wife is disabled and that her disability falls under Paragraph 12 of the Agreement is not contrary to the clear weight of the evidence or the law. This leaves for consideration the issues relating to the amount and terms of the award to Wife.

■ ¶ 30 Paragraph 12 obligates the non-disabled party to be responsible "for the care of the disabled party." Wife sponsored an exhibit listing items totaling $6,300.00 per month.[16] The trial court reduced that amount to $4,825.00 per month and gave credit for the Social Security benefit of $600.00 per month. The trial court characterized the award as "reasonable and necessary living expenses." However, the trial court did not specify the source of the reduction from Wife's claim.[17] The trial court further characterized the award as "support"

14. Cases such as *Johnson v. Special Indemnity Fund*, 1999 OK CIV APP 106, 990 P.2d 323, where the Social Security disability determination could not be used to determine disability in a workers' compensation matter, do not apply here. The workers' compensation scheme defines disability for its purposes. Here, the ordinary dictionary definition is given to the word "disability" and the evidence, other than the ALJ Decision, supports the finding of disability.

15. Husband's arguments about whether the trial court erred in considering the ALJ Decision are moot. The issue was Wife's "disability" pursu-

ant to Paragraph 12. The trial court's determination of disability under Paragraph 12 is not contrary to the clear weight of the evidence, even by excluding the ALJ Decision.

16. Ex. 53, Trial Transcript, June 16, 2010, p. 188. A copy is appended as Tab 7 to Appellant's Motion to Pay Funds Into Court Pending Appeal, filed with the Supreme Court on July 8, 2010.

17. Transcript of Decision, September 17, 2010, pp. 10–11.

under paragraph 12 of the Agreement.[18]

¶ 31 The ordinary meaning of the word "care" in the context of this case is to "provide for or attend to needs." Webster's Third International Dictionary, p. 338 (1986). This is the meaning given by this Court because there is no other meaning given in the Agreement.

¶ 32 Alimony, as support, is a different matter.

Support alimony is based on a consideration of relevant factors including: demonstrated need during the post-divorce economic readjustment period; the parties' station in life; the length of the marriage and the ages of the spouses; the earning capacity of the parties as well as their physical condition and financial means; the accustomed style of living of the parties; evidence of a spouse's own income-producing capacity and the time needed to make the post-divorce transition for self-support.

*Hutchings v. Hutchings*, 2011 OK 17, ¶ 16, 250 P.3d 324, 327.

¶ 33 This Court observes that Wife's list of financial needs is similar to support alimony claims. Thus, she has listed vacations, life insurance, entertainment, religious donations, investments, hobbies and gifts. Wife acknowledged that some of her health care costs listed were for matters not associated with the cause of her disability in this case. She listed medications, but had not taken medications for over a year at the time of trial.[19] Wife estimated many of her listed expenses, and in some instances, the expense was for a year and not a monthly sum.

¶ 34 While elements of "care" and elements of "support alimony" overlap, the parties here specifically disavowed claims for support alimony in Paragraph 11 of the Agreement. The parties agreed to be responsible for "care." Moreover, this Court finds that the reasonable construction of Agreement's provision of responsibility for care is responsibility for care directly related to the disability. This Court also finds that the reasonable construction of the scope of the "care" is that the scope of "care" might change over time in response to worsening or improvement of the reason for the disability or the availability to the disabled party of other resources.[20]

¶ 35 The Agreement's text lacks specificity regarding what specifically comprises the scope of "care." A lack of specificity in either the amount or scope of an obligation does not necessarily mean an absence of a judicially enforceable obligation. *Holleyman v. Holleyman*, 2003 OK 48, ¶ 12, 78 P.3d 921, 926. However, after the finding of disability, the trial court did not determine the intent of the parties regarding what comprises the scope of care for the disabled party because of the disability, including provision for modification and termination. Alternatively, to the extent that such intent might not be ascertainable, the trial court did not determine what would be reasonable and necessary to include in the amount or scope of the "care" obligation because of the disability, including provision for modification and termination, bearing in mind that the parties have agreed to disavow support.[21]

¶ 36 Therefore, it is necessary to remand this matter to the trial court for these determinations. The appellate court does not make first instance determinations of facts or law. *Holleyman*, 2003 OK 48 at ¶ 17, 78 P.3d at 928.

18. *Id.*

19. Trial Transcript, June 16, 2010, p. 197.

20. Thus, the trial court correctly credited the Social Security benefits to the expenses. As examples only of additional circumstances for future consideration, there might be cost-of-living increases in her Social Security benefits. Health care costs fluctuate and health insurance is a matter of national concern. Wife might remarry or cohabit with another person and receive financial support for some elements of her care. The ALJ Decision requires periodic reviews to determine whether Wife remains disabled and is unable to work thereby possibly decreasing the Social Security benefit. Increases might occur as a result of statutory cost-of-living adjustments.

21. Husband's contention here that he cannot afford the cost is no longer an issue in this appeal because of the disposition of the appeal by this Court.

## CONCLUSION

¶ 37 The parties entered into an enforceable Agreement for one of them to assume complete responsibility for the care of the disabled party. The conclusion that Wife is the disabled party is not contrary to the clear weight of the totality of the evidence.

¶ 38 However, the obligation is to provide for "care" and that does not mean lifestyle support. Although "support" and "care" may share common elements, here the obligation arises because of disability. Therefore, on remand, the trial court shall determine the parties' intent regarding what comprises the scope of care because of Wife's disability, including provision for modification and termination. To the extent that such intent might not be ascertainable, the trial court shall determine what would be reasonable and necessary to include in the amount or scope of the obligation for care, including provision for modification and termination, to provide for Wife's "care" because of her disability, bearing in mind that the parties have agreed to disavow support.

¶ 39 The judgment of the trial court is affirmed in part and reversed in part. The cause is remanded for further proceedings in accord with this Opinion.

¶ 40 **AFFIRMED IN PART AND REVERSED IN PART AND REMANDED FOR FURTHER PROCEEDINGS.**

GOODMAN, P.J., and THORNBRUGH, J., concur.